LOWE v HOTEL & RESTAURANT EMPLOYEES UNION, LOCAL
705

1. APPEAL AND ERROR—PROOFS—INFERENCES—EVIDENCE.

   The Michigan Supreme Court must regard all proofs in the light
   most favorable to the plaintiff where the jury found for the
   plaintiff and the Court must accept, as well, all inferences
   which the jury could fairly have drawn from the evidence in
   the plaintiff's favor.

2. LABOR RELATIONS—APPEAL AND ERROR—VERDICT.

   Since plaintiff recovered a jury verdict, and since all factual
   matters must therefore be resolved in favor of the plaintiff, the
   Michigan Supreme Court concludes that he was in fact wrong-
   fully discharged from his employment by his employer in
   violation of a collective bargaining agreement between the
   employer and the defendant union.

3. LABOR RELATIONS—UNIONS—EXHAUSTION OF REMEDIES.

   The Constitution of the Hotel and Restaurant Employees Interna-
   tional Union requires exhaustion of the remedies there pro-
   vided only in cases (1) *relating to or affecting the affairs of such
   international union or affiliate,* and (2) *respecting the trial of
   charges or appeals therefrom.*

4. LABOR RELATIONS—UNIONS—UNION MEMBERS—EXHAUSTION OF
   REMEDIES—DAMAGES—TRIAL.

   The Constitution of the Hotel and Restaurant Employees Interna-
   tional Union does not require exhaustion of intra-union remedy
   where the right which is sought to be asserted in court is a

REFERENCES FOR POINTS IN HEADNOTES

[1] 53 Am Jur, Trial § 186.
[2] 48 Am Jur 2d, Labor and Labor Relations § 1238 *et seq.*
[3, 4] 48 Am Jur 2d, Labor and Labor Relations §§ 334, 356–359.
[5, 6] 48 Am Jur 2d, Labor and Labor Relations §§ 56, 273 *et seq.*
[7] 48 Am Jur 2d, Labor and Labor Relations § 274.
[8] 48 Am Jur 2d, Labor and Labor Relations § 1298 *et seq.*
[9, 11] 48 Am Jur 2d, Labor and Labor Relations § 273 *et seq.*
[10] 53 Am Jur, Trial § 584 *et seq.*
[12] 30 Am Jur 2d, Evidence § 1080 *et seq.*

claim for damages by a member against the union and does not touch upon the internal policy or affairs of the union, nor involve the trial of disciplinary charges against the member affecting his membership or status in the union.

5. LABOR RELATIONS—UNIONS—UNION MEMBERS.

A labor union has a duty fairly to represent its members and this duty arises from the nature of the relationship between the union and its members; the union and its members do not deal at arms length.

6. LABOR RELATIONS—UNIONS—UNION MEMBERS—FIDUCIARY RELATIONSHIP.

The relationship between a union and its member is a fiduciary one, in many ways; certainly, it is a relationship of fidelity, of faith, of trust, and of confidence.

7. LABOR RELATIONS—UNIONS—UNION MEMBERS—DISCRETION.

The discretion of a union to choose the general good of the total membership is paramount when the general good conflicts with the needs or desires of an individual member.

8. LABOR RELATIONS—UNIONS—UNION MEMBERS—COURTS—LEGAL RIGHTS—CIVIL RIGHTS.

Courts will recognize the legal or civil rights of an individual member and enforce them as against the will of the majority of the union membership when the general good of the total membership conflicts with those rights of an individual member.

9. LABOR RELATIONS—UNIONS—UNION MEMBERS—DISCRETION— GRIEVANCES.

A union must act without fraud, bad faith, hostility, discrimination, arbitrariness, caprice, gross nonfeasance, collusion, bias, prejudice, wilful, wanton, wrongful and malicious refusal, personal spite, ill will, bad feelings, improper motives, misconduct, overreaching, unreasonable action, or gross abuse of its discretion in processing or refusing or failing to process a member's grievance.

10. LABOR RELATIONS—UNIONS—GRIEVANCES—ARBITRATION—INSTRUCTIONS.

The jury was properly advised in the trial court's instructions that plaintiff should recover only if it found the union's refusal to take plaintiff's grievance to arbitration was arbitrary and not a fair, reasonable and honest judgment on defendants' part where defendants did not object to the charge and the com-

plaint alleged a duty of representation by his union, a breach of that duty, and facts from which a conclusion could be drawn that the defendant union's action was arbitrary and the product of bad faith.

11. LABOR RELATIONS—UNIONS—GRIEVANCES.

An unfettered discretion reposed in a union to settle an employee-member's grievance is not the same as a right to abandon the grievance.

12. LABOR RELATIONS—WRONGFUL DISCHARGE—UNIONS—GRIEVANCES.

Testimony adduced at trial and evidence presented to the jury, taken in the light most favorable to the plaintiff, was sufficient for the jury to have concluded that the plaintiff was wrongfully discharged by his employer and that the defendant union violated its obligation toward him to afford him fair representation by making no effort whatsoever to settle his grievance, by ignoring his grievance, by processing it in a perfunctory manner, and that the plaintiff was not required, either as a matter of fact or law, to make a formal appeal to the international president or the international executive board as a condition precedent to an action against the employer and the union.

Appeal from Court of Appeals, Division 1, V. J. Brennan, P. J., and J. H. Gillis and T. M. Burns, JJ., reversing and remanding Wayne, Neal Fitzgerald, J. Submitted November 9, 1972. (No. 1 November Term 1972, Docket No. 53,719.) Decided March 22, 1973, Rehearing denied April 26, 1973. Motion for reconsideration of denial of rehearing denied October 10, 1973.

36 Mich App 66 reversed.

Complaint by Richard Lowe against the Young Women's Christian Association for damages for wrongful discharge and against the Hotel & Restaurant Employees Union, Local 705, and Myra Wolfgang for failure to process his grievance in good faith, and against all defendants for conspiring against him and depriving him of his employment. Y.W.C.A. dismissed as a party defendant. Judgment for plaintiff. Defendants Union and Myra Wolfgang appealed to the Court of Appeals.

Reversed and remanded. Plaintiff appeals. Reversed and remanded.

*Eddie D. Smith,* for plaintiff.

*Goodman, Eden, Robb, Millender, Goodman & Bedrosian,* for defendants Hotel & Restaurant Employees Union, Local 705, and Myra Wolfgang.

*Amicus Curiae:* UAW (by *Stephen I. Schlossberg, John A. Fillion* and *Jordan Rossen).*

T. E. BRENNAN, J.

## THE CASE

Plaintiff instituted this action in Wayne County Circuit Court on April 30, 1964, naming the Y.W.C.A., Local 705, Hotel and Restaurant Employees Union, and Myra Wolfgang, its secretary, as defendants.

His complaint alleged that plaintiff was an employee of the Y.W.C.A.; that a collective bargaining agreement, dated March 1, 1962, was signed by and between the Local Union and the Y.W.C.A. for the benefit of the employees of the latter, including plaintiff; that the agreement provided:

" 'The employer retains full right to employ and discharge as employees such person as it deems best in the conduct of its work. Both the Union and the employer agree to be governed by sound labor relations. If an employee has a grievance under the terms and provisions of this agreement, it shall be handled in the manner hereinafter set forth:' "

The complaint further alleged that plaintiff was discharged from his job without good cause; that his discharge was based upon discriminatory prac-

tices, flimsy accusations, conspiracy between the union and his employer, that two prior disciplinary letters, upon which his discharge was predicated, were not founded upon misconduct, and that the defendant union refused to take his case to arbitration as provided in the collective bargaining agreement.

Defendants moved for summary judgment on the ground that plaintiff had failed to exhaust his intra-union remedies. The motion was heard and granted on February 17, 1965, and an order to that effect was entered on March 24, 1965.

Plaintiff filed a "motion to reinstate", which was denied on July 12, 1965.

On July 15, 1965, plaintiff filed a "motion for rehearing of the motion to reinstate". The circuit court granted the motion on January 12, 1966, and entered an order reinstating the cause on June 28 of the same year.

On August 19, 1969, an order for discontinuance of the cause as to the Y.W.C.A. was entered upon stipulation of the parties. Later testimony showed that a separate settlement had been made wherein the Y.W.C.A. paid $2,000 to the plaintiff.

Jury trial proceeded in January of 1970; verdict of $7,990 was returned against the two remaining defendants. Judgment was entered thereon.

From denial of defendants' motion for judgment *n.o.v.* or new trial, appeal was taken to the Court of Appeals. That Court reversed and remanded, in a divided opinion. Reported at 36 Mich App 66.

We granted leave to review the conclusion of the Court of Appeals that there was insufficient evidence from which the jury could have concluded that the defendant union and its secretary breached their duty of fair representation toward the plaintiff.

## THE FACTS

The recitation of facts which follows would be hotly disputed by the defendants. Indeed, the facts were disputed at the trial, much contrary evidence being presented by the defendants.

We must, nevertheless, in the appellate posture of this case, regard all proofs in the light most favorable to the plaintiff. We must accept, as well, all inferences which the jury could fairly have drawn from the evidence in the plaintiff's favor.

Viewing the evidence in this light, the facts are these:

For some 14 years prior to April 18, 1963, plaintiff was employed as a maintenance man by the Young Women's Christian Association (Y.W.C.A.) in Detroit. Plaintiff was, during that time, a member of the defendant Hotel and Restaurant Employees Union, Local 705. For at least ten of those years, plaintiff was the shop steward of such local union at the Y.W.C.A., a position to which he was elected by his fellow employees.

It was not the practice of the Y.W.C.A. to pay overtime wages for work performed after the usual hours of employment. Plaintiff's usual work day ended in mid-afternoon. It was his custom to pick up his daughter from school, since she suffered with rheumatic fever.

On April 18, 1958, at 2:20 p.m., plaintiff was requested by his supervisor at the Y.W.C.A. to take care of an emergency situation. He refused.

On April 25, 1958, plaintiff received the following letter from his employer:

"Mr. Richard Lowe
"Y.W.C.A.

"The Y.W.C.A. employs staff in order to give good service to the public.

"On Friday, April 18, 1958, at 2:20 p.m., you were requested to take care of an emergency situation and refused to do so because it was nearly time for you to leave. Your services were badly needed.

"Because of this instance, we want to inform you that not carrying out requests from your supervisor is good cause for replacement.

"This is therefore a warning that if such a situation should occur in the future, you will be relieved of your job.

> "Very sincerely,
>
> "/s/ Mrs. Peggy Eckhardt,
> "Building Maintenance Director.
> "/s/ Ruth E. West,
> "Executive Director.

"CC: Miss Smith
     Miss Stowell"

The Y.W.C.A. had a policy with respect to its personnel to the effect that termination of employment would follow after the issuance of two written warnings concerning unsatisfactory service. Plaintiff was aware of this policy. Upon receiving the April 25, 1958, letter, plaintiff went to his union representatives. He was told not to pay any attention to the letter, that it would be taken care of. He discussed the letter also with his supervisors at the Y.W.C.A. They advised him not to pay attention to the letter, that it would not be held against him.

Almost exactly four years later, on April 20, 1962, plaintiff received a second letter from his supervisor. It stated:

"Mr. Richard Lowe
"Y W C A

"Dear Mr. Lowe:

"Following the incident in my office this afternoon, I feel impelled to put into writing my feelings about this matter.

"You have worked for the YWCA for 14 years and should know our policy regarding time off to attend Good Friday Church Services. In case there is any question in your mind, the policy is as follows:

"Any employee who wishes to attend church on Good Friday is given one hour off to do so. The employee need only contact his supervisor and arrange for this time so that she can schedule another person to take his place or relieve him.

"Many of us never get to attend church on Good Friday because of the nature of our jobs.

"You are probably not aware that the YWCA locally and nationally has always fostered the development of a responsible labor movement. As Steward of your local you should want to set an example for other employees. In my estimation you fail in this respect.

"Your repeated outbursts of temper are becoming more and more unbearable. I have spoken to you about your attitude on many occasions' but after today's performance, I am convinced that my warnings have been completely ignored.

"Your abusive behavior tends to lower the morale of the entire Maintenance Department, and we cannot allow it to go on.

"Very sincerely,

"/s/ Peggy H. Eckhardt,

"Building Maintenance Director

"C.C. Miss D. Mudge
    Mrs. V. Stone"

Plaintiff's participation in the dispute which gave rise to the April 20, 1962, letter was in his capacity as shop steward for the Y.W.C.A. employed members of Local 705.

Upon receipt of this second warning letter, plaintiff once again called upon his union representative and was told again to disregard the letter, that it would be taken care of. As in 1958, he discussed the 1962 letter with his superiors at the Y.W.C.A. and was again told that the letter would not be held against him.

Plaintiff's employment was governed by a collective bargaining agreement between the Y.W.C.A. and defendant union. That agreement provided for the following procedure respecting the settlement of employee grievances:

"Step 1 The aggrieved employe or the Union shall take the grievance up with his department head.

"Step 2 If the grievance is not settled under Step 1, the aggrieved employe shall take the grievance up with his local Union who shall attempt to adjust the matter with Management.

"Step 3 If the grievance cannot be settled by Step 2, it shall be presented by the Union to the representative of the Young Women's Christian Association. If the decision of the representative of the Young Women's Christian Association is unacceptable either to the Union or to the Employer either party shall have the right to demand arbitration in accordance with the following step.

"Step 4 The arbitrator shall be selected from a list furnished by the State Labor Mediation Board. Upon the appointment of an arbitrator selected from a list furnished by the State Labor Mediation Board, the subject matter of the grievance shall be submitted to the arbitrator within five (5) days after the selection of the arbitrator unless the parties mutually agree upon a longer period of time. Evidence shall be submitted by both parties within ten (10) days thereafter. The decision of the arbitrator shall be final and conclusive upon both parties and both parties agree to abide by the award of the arbitrator. The fees and expenses of the arbitrator shall be shared equally between the parties."

Neither the 1958 nor the 1962 difficulties were made of subject of arbitration under Step 4 nor conciliation under Step 3 of the collective bargaining agreement.

On April 17, 1963, one year after the Good Friday incident, and five years after the first written reprimand, an incident occurred at the Y.W.C.A. involving plaintiff and one Mrs. Logan, a fellow employee and member of Local 705. That incident was not a fight, but plaintiff did, at one point, take hold of Mrs. Logan's arm to prevent her from striking him.

The next day, plaintiff received the following letter from his employer:

"Mr. Richard Lowe
"Y W C A
"2230 Witherell
"Detroit 1, Michigan

"Dear Mr. Lowe:

"As a result of the incident which took place here on April 17th, your services are being terminated effective immediately.

"Please turn in your keys at the front desk before leaving the building.

"Your final check will be sent to you next week.

"Yours truly,
"/s/ Dorothy E. Mudge,
"Executive Director.

"DEM:m
"cc: Mrs. Virginia Stone
    "Miss Isabelle Smith
    "Mrs. Peg Eckhardt"

Upon receiving this third letter, plaintiff again went to see his union representatives. They refused to discuss the matter with him. He returned to the Y.W.C.A., and called upon the executive director. She advised him that the Y.W.C.A. and

the union had already come to the conclusion that he was to be discharged. She added, "There is nothing I can do for you."

Plaintiff then took his complaint to the grievance committee of Local 705. The local's grievance committee took no action, except to recommend that plaintiff write to defendant Myra Wolfgang, Secretary-Treasurer of the local union.

The purpose of such letter was to obtain a hearing before the Executive Board of Local 705. Plaintiff wrote such letter on April 23, 1963, with a copy to Mr. E. S. Miller, President of the International Union. On April 29, 1963, Mrs. Wolfgang wrote to the plaintiff as follows:

"Mr. Richard Lowe
"3664 Sylvester
"Detroit 7, Michigan

"Dear Brother Lowe:
    "Received your letter of the 23rd this morning as I was out-of-town for the entire week of the 22nd.
    "I am writing to advise you that the Executive Board of Local 705 meets this Wednesday, May 1, 1963, 3:00 P.M., 100 Selden, Union Headquarters. I am, therefore, inviting you to appear before the Executive Board at that time.
    "Trusting to see you then, I remain

"Fraternally yours,
"Myra K. Wolfgang
"Secretary-Treasurer"

The Executive Board consists of 21 persons elected by the members of the local union. It met on May 1, 1963, considered plaintiff's grievance, and referred the matter to defendant Wolfgang for further investigation.

Mrs. Wolfgang directed one Mortimer Furay, a union representative, to conduct the investigation.

Mr. Furay had known plaintiff for many years, and knew of his relationship with the women he worked with. Mr. Furay felt that the plaintiff did not deserve to be reinstated in his job.

Mr. Furay's investigation consisted of a telephone call to the Y.W.C.A., an interview with a supervisor at the Y.W.C.A., interviews with plaintiff and Mrs. Logan, and interviews with other employees. Among those interviewed, no one but plaintiff and Mrs. Logan had observed the inception of the incident. Mr. Furay was unable to determine where the fault lay for instigating the altercation. He nonetheless concluded that plaintiff had attacked Mrs. Logan, that plaintiff had choked her, that plaintiff was "in the wrong," that the Y.W.C.A. had a good case against plaintiff which would be lost by the union if it insisted upon arbitration.

Mr. Furay recommended against arbitration.

On May 9, 1963, the Y.W.C.A. sent the following letter to the union:

"Mrs. Myra Wolfgang
"Sec.-Treas. of Local 705
"100 Selden
"Detroit 1, Michigan

"Att: Mr. Mort Furay

"Dear Mrs. Wolfgang:

"At approximately 8:00 o'clock on the morning of Wednesday, April 17, two of the YWCA maintenance employees, Mr. Richard Lowe and Mrs. Rosie Lee Logan, were involved in a fight which resulted in Mr. Lowe's termination of employment and a two-weeks' suspension of services of Mrs. Logan.

"Unfortunately, neither Mrs. Stone nor I were in the building at the time the incident took place, but when I returned from a meeting at approximately 11:30, I was notified that the fight had taken place and that most of

the maids were so upset, they were hysterical following the incident.

"Mrs. Stone and Mrs. Eckhardt came to my office and we talked to Mrs. Logan and Mr. Lowe separately. Their explanations of the occurrence were somewhat different, but we understand from their descriptions that it had begun in an argument which resulted in the use of vile language, followed by actual fisticuffs and bodily contact. There was only one witness to the altercation and when questioned, he did not wish to become involved and would make no statement. We respected his feelings in the matter and did not press him for any statement.

"It has been the practice at the YWCA to speak to employees about unsatisfactory job performance when the occasion warranted it and to send warning letters. If an employee receives two warning letters and still has trouble, the result is termination of services. Mr. Lowe had received two previous letters.

"At other times, other employees in the building have complained that he is uncooperative and now we find that one of the women who works at our front desk will not call the freight elevator when he is relieving there, nor will she ask him to help in any way because of his attitude.

"Mrs. Logan has been a satisfactory maid and this is the first time that she has been involved in such a situation.

"We regret very much that this incident occurred, but I am sure that you will agree that we cannot have these things happening in a building where there are many young people.

> "Very sincerely,
> "Dorothy E. Mudge,
> "Executive Director."

On May 17, 1963, the following letter went forward from Mrs. Wolfgang to the plaintiff:

"Richard Lowe
"3664 Sylvester
"Detroit 7, Michigan
"Dear Sir and Brother:
    "At the last meeting of Local 705's Executive Board, your dispute with the YWCA was referred to me for action.
    "In following out that directive, I asked the officials of the YWCA to send us a letter, incorporating the reasons why you were dismissed. We have received such a letter, copy of which is enclosed, and the matter is being referred to the next Executive Board Meeting of Local 705, which will be held Wednesday, June 5th.

"Fraternally yours,
"Myra K. Wolfgang
"Secretary-Treasurer

"PS: I am taking the liberty of forwarding a copy of your discharge letter to your attorney."

No action was taken with respect to plaintiff's complaint at the Executive Board meeting of June 5, 1963. Plaintiff again wrote to Mrs. Wolfgang on June 16, 1963. Her reply, dated June 18, 1963, was as follows:

"Mr. Richard Lowe
"3664 Sylvester
"Detroit 7, Michigan
"Dear Mr. Lowe:
    "Your letter of June 16th has been received and its contents noted. The next meeting of the Executive Board will be held:

"Date: Wednesday, July 3rd, 1963.
"Time: 3:00 P.M.
"Place: Union Headquarters
        "100 Selden
        "Detroit 1, Michigan

        "We hope to see you at that time.

"Very truly yours,
"Myra K. Wolfgang
"Secretary-Treasurer"

Plaintiff appeared at the July 3, 1963, Executive Board meeting, in the company of his attorney. His attorney was not permitted to enter the meeting room or participate in its proceedings.

Plaintiff's attorney wrote to Mrs. Wolfgang, under date of July 17, 1963:

"Hotel & Restaurant Employees Union
"Local 705
"100 Selden Avenue
"Detroit 1, Michigan
"Attention: Myra K. Wolfgang
"Re: Richard Lowe and Y.W.C.A.

"Dear Miss Wolfgang:

"Approximately two weeks ago Mr. Lowe appeared before the Executive Board of Local 705, with reference to a dispute with the Y.W.C.A. At that time he was informed that notice of any decision reached by the Board would be forwarded to him within a week.

"As of this date Mr. Lowe is unemployed and must draw on his savings in order to sustain himself and his family. As a result he is contemplating legal action for wrongful discharge under Public Law 86-257 86 Congress, S. 1555 February 14, 1959, as a third party beneficiary of the contract between the Hotel & Restaurant Employees Union Local 705 and Y.W.C.A. From a review of the case as given to me, with reference to the aforementioned dispute, it is my opinion that there is a good possibility of Mr. Lowe's being reinstated by the Y.W.C.A.

"Please inform me at your earliest convenience of the decision reached with reference to the aforementioned matter so that I may be able to advise Mr. Lowe with reference to his rights.

"Thanking you for your cooperation and consideration, I remain

"Yours very truly,
"Eddie D. Smith"

Mrs. Wolfgang replied the next day:

"Mr. Eddie D. Smith, Esquire
"1346 Broadway
"Detroit 26, Michigan

"Dear Mr. Smith:

   "We are in receipt of your letter of July 17th.

   "A letter was sent to Richard Lowe dated July 15th, describing the decision of the Executive Board of Local 705. This decision was reached after a full investigation into the matter. We are enclosing a copy of the letter sent to Mr. Lowe.

   "If you would like to discuss this matter with me, please do not hesitate to do so. However, as indicated before, there was a thorough review of the grievance filed by Mr. Lowe, and the Executive Board was forced to conclude that the evidence available to it presented no alternative under the prevailing collective bargaining agreement, but to decide against the grievance.

                    "Very truly yours,
                    "Myra K. Wolfgang
                    "Secretary-Treasurer"

   The July 15, 1963, letter to plaintiff, referenced in her July 18 reply to Mr. Smith, was also put in evidence at the trial of this cause. It reads:

"Mr. Richard Lowe
"3664 Sylvester
"Detroit, Michigan

"Dear Mr. Lowe:

   "As you know, your grievance was considered at the meeting of the Executive Board of Local 705 on Wednesday, July 3, 1963. The Executive Board had commenced its consideration of your grievance at its meeting held in May, 1963.

   "After there was a full testimony regarding your grievance, the Executive Board carefully discussed and weighed all of the evidence available to it. The members of the Board felt that your grievance must be denied because of the testimony and documents presented to it.

   "The Y.W.C.A. has a clear policy that discharge will

follow the issuance of a third disciplinary letter to any employee. In this case, there was an altercation in which you were, at least, partially guilty, according to the evidence; and this incident resulted in the receipt by you of your third disciplinary letter.

"The Union realizes that it has a serious obligation to all members to represent them fully and fairly. This obligation includes a duty to investigate carefully all grievances filed by members. The Union has done so in your case. Under the grievance procedure, the Union also has an obligation, after a full investigation, to determine whether there is merit to a grievance. Under the collective bargaining agreement, the Union may take cases to arbitration, but only in instances where the employer action does not seem warranted. The Union simply cannot, in view of all the facts in your case, adopt the position that the employer's action was unwarranted, and was in violation of the governing collective bargaining agreement.

> "Sincerely yours,
>
> "Myra K. Wolfgang
> "Secretary-Treasurer"

Plaintiff again wrote to International President Miller on August 2, 1963. His answer is dated August 5, 1963:

"Mr. Richard Lowe
"3664 Sylvester
"Detroit 7, Michigan

"Dear Sir and Brother:

"I have your letter of August 2, 1963, wherein you again advise this office that nothing has been done for you in Local 705.

"In checking back to your original letter to this office of April 23, 1963, it is noted that a copy of that letter was sent to Secretary Wolfgang of Local 705 and Secretary Wolfgang advised this office on April 29, 1963, that you were asked to appear before the Executive Board of Local 705 which met on Wednesday, May 1, 1963, at 3 p.m. I must assume that you did meet with the Execu-

tive Board and at that time advised the Executive
Board just what was involved in your grievance.

"I want to advise you that I am sending a copy of
your letter dated August 2, 1963, as well as a copy of
this communication to Secretary Wolfgang of your local
union and I suggest that you discuss with Secretary
Wolfgang the basis for your contention that no one in
Local 705 has given your case any consideration.

"I know, from past experiences, that Secretary Wolf-
gang will give you all the consideration possible and if
you have a just grievance she will either investigate
herself or assign someone-else within the local union to
make a thorough investigation.

                    "Fraternally yours,
                    "/s/ Ed S. Miller,
                    "General President"

The Constitution of the Hotel and Restaurant
Employees International Union, contains the fol-
lowing provisions:

"Section 11. Appeal Bodies. Appeals may be taken
from a decision of a Local Union to the Joint Executive
Board, if one exists. If no such Board exists, the appeal
may be taken to the General President. Decisions of the
Joint Executive Board may be appealed to the General
President. Decisions of the General President may be
appealed to the General Executive Board, and decisions
of the General Executive Board may be appealed to the
Convention.

"Section 12. Limitation on Right of Members to Ap-
peal. Notwithstanding the provisions of Section II of
Article XX, an appeal of a member may not be taken
beyond the General Executive Board unless specifically
authorized by the provisions of this Constitution. A
member shall be deemed to have exhausted his reme-
dies of appeal in accordance with the requirements of
Section 19 hereof, following an appeal to the General
Executive Board.

                    *   *   *

"Section 19. Obligation to Exhaust Remedies. Every
member or affiliate of the International Union feeling
aggrieved by any action taken or failure to act by the

International Union, its officers, or any subordinate
affiliate of the International Union, or the officers or
members thereof, with respect to any matter or thing
relating to or affecting the affairs of such International
Union or affiliate or with respect to the trial of charges
or appeals therefrom, shall be required to exhaust all
remedies of appeal and protest permitted such member
or affiliate under the terms of this Constitution before
resorting to any Court or other tribunal."

## WRONGFUL DISCHARGE

For the purpose of this decision, it is necessary
for the Court to regard the plaintiff as having been
wrongfully discharged from his employment by the
Y.W.C.A. This is true despite the quoted language
from the contract of employment which is con-
tained in the plaintiff's complaint to the effect that
the Y.W.C.A. had full right to employ and dis-
charge employees as it deems best. No allegation
was made in the complaint specifying any contract
provision which was violated by the plaintiff's
discharge, unless it be the general language that
the employer would be governed by sound labor
relations.

Nonetheless, the complaint alleges that the
plaintiff was wrongfully and without good cause
discharged from his job and the defendant union
has not taken the position that the employer was
free to discharge the plaintiff upon any considera-
tion whatsoever. This lawsuit was tried on other
theories, both sides apparently presuming that a
wrongful discharge was at least possible under the
collective bargaining agreement.

Since the plaintiff recovered a jury verdict, and
since all factual matters must therefore be re-
solved in favor of the plaintiff, we conclude that
the plaintiff was in fact wrongfully discharged
from his employment by the Y.W.C.A. in violation

of the collective bargaining agreement between the Y.W.C.A. and the defendant union.

## EXHAUSTION OF INTRA-UNION REMEDY

While the Court of Appeals reversed the trial court on other grounds, defendants have argued here that the Court of Appeals' treatment of the exhaustion issue was in error.

It is appropriate here to review the Michigan rule of intra-union remedy exhaustion.

It is often stated that a union member must exhaust his intra-union remedy before having to resort to the courts against the union of which he is a member. *Knox v Local 900, UAW,* 361 Mich 257 (1960); *Duffy v Kelly,* 353 Mich 682 (1958); *Sewell v Detroit Electrical Contractors Association,* 345 Mich 93 (1956); *Holman v Industrial Stamping & Manufacturing Co,* 344 Mich 235 (1955); *Martin v Favell,* 344 Mich 215 (1955); *Zdero v Briggs Manufacturing Co,* 338 Mich 549 (1953); *Mayo v Great Lakes Greyhound Lines,* 333 Mich 205 (1952); and *Harris v Detroit Typographical Union,* 144 Mich 422 (1906).

There are other Michigan decisions, *Ryan v New York Central R Co,* 267 Mich 202 (1934), and *Hartley v Brotherhood of Railway Employees,* 283 Mich 201 (1938), in which our Court has gone beyond the matter of mere exhaustion of remedy within the union, and held, more comprehensively, that where an intra-union remedy is provided, the courts will not interfere in a dispute between a member and his union, in the absence of fraud, etc.

On this view, it is immaterial whether the member has exhausted his intra-union remedy. Indeed,

both *Ryan* and *Hartley* were cases in which exhaustion was claimed. The *Ryan* rule simply makes the decision of the internal union tribunal conclusive upon the courts, in the absence of fraud. In such a case, only grounds for equitable relief are germane.

Under the *Ryan* rule, the mere existence of intra-union remedies excludes an action at law against the union.

*Ryan* was grounded upon a line of Michigan decisions in fraternal and mutual benefit association cases. *Van Poucke v The Netherland St. Vincent De Paul Society,* 63 Mich 378 (1886); *Canfield v The Great Camp of the Knights of the Maccabees for the State of Michigan,* 87 Mich 626 (1891); *Fillmore v The Great Camp of the Knights of the Maccabees for Michigan,* 103 Mich 437 (1895); and *Howe v Patrons' Mutual Fire Ins Co of Michigan,* 216 Mich 560 (1921) to mention just a few.

These and other cases were a departure from the general rule that arbitration clauses in contracts generally were not binding upon the parties, until the arbitration had taken place, and an award entered. *McGunn v Hanlin,* 29 Mich 476 (1874); *Siewek v F Joseph Lamb Co,* 257 Mich 670 (1932); and *Chadwick v Phoenix Accident & Sick Benefit Ass'n,* 143 Mich 481 (1906).

The *Van Poucke* line of cases reasoned that voluntary associations, formed for the mutual benefit of the members on a cooperative basis, needed inexpensive means to dispose of disputes within the order. In light of the charitable and fraternal purposes of such societies, it was supposed that fairness, even magnanimity would be displayed by their internal tribunals.

In this view, Michigan was, and still is, in the

minority of American jurisdictions. 51 ALR 1425 *et seq.; Howe v Patrons' Mutual, supra.*

The prevailing view is that, even where provided in the bylaws of a fraternal society as the exclusive remedy, intra-societal tribunals do not supersede the jurisdiction of the courts, where the member seeks to enforce a right of property or of contract or a money demand against the society. In matters of discipline and internal policy, the rule is otherwise. 36 Am Jur 2d, Fraternal Orders, § 48, p 841 *et seq.*

In fraternal benefit cases, our Court has, from time to time, indicated a propensity to limit the *Van Poucke* rule. Thus, in *Wuerthner v Workingmen's Benevolent Society,* 121 Mich 90 (1899), it was held that where resort to the courts was not prohibited expressly by the order's bylaws, the bylaw was not a bar to suit, the Court there saying, "[a] strict construction should be given to provisions abridging the common right of resort to the courts."

In the case at bar, the Constitution of the *Hotel and Restaurant Employees International Union,* quoted *supra,* applies to all of the union's affiliates, and cannot be supposed to have been written with Michigan case law specifically in mind. Thus, it requires exhaustion of the remedies there provided only in cases (1) *relating to or affecting the affairs of such international union or affiliate,* and (2) *respecting the trial of charges or appeals therefrom.*

The similarity of the union's constitution to the general view of American courts that such provisions are binding only in cases of discipline and internal policy does not pass without notice.

Under the authority of *Wuerthner (supra)* we hold that the union's constitution does not require

exhaustion of intra-union remedy where, as here, the right which is sought to be asserted in court is a claim for damages by a member against the union, and does not touch upon the internal policy or affairs of the union, nor involve the trial of disciplinary charges against the member affecting his membership or status in the union.

## THE DUTY OF FAIR REPRESENTATION

A labor union has a duty fairly to represent its members.

This duty arises from the nature of the relationship between the union and its members. The union and its members do not deal at arms length.

The union speaks for the member. It makes a contract of employment on his behalf. The union offers its member solidarity with co-workers, expertise in negotiation, and faithful representation. In exchange, the member pays his union dues, and gives his support and loyalty to the union.

In many ways, the relationship between a union and its member is a fiduciary one. Certainly, it is a relationship of fidelity, of faith, of trust, and of confidence.

If the courts have stopped short of declaring the union and member relationship a fully fiduciary one, it is because the union, by its nature, has a divided loyalty.

It must be faithful to each member, to be sure, but it must be faithful to all of the members at one and the same time.

The union must be concerned for the common good of the entire membership. This is its first duty.

That duty of concern for the good of the total membership may sometimes conflict with the

needs, the desires, even the rights of an individual member.

When the general good conflicts with the needs or desires of an individual member, the discretion of the union to choose the former is paramount.

When the general good conflicts with the legal or civil rights of an individual member, the courts will recognize those rights and enforce them as against the will of the majority of the union membership.

In the area of grievances, the courts have held that the union has considerable discretion to decide which grievances shall be pressed and which shall be settled. It has been said that the union has latitude to investigate claimed grievances by members against their employers, and has the power to abandon frivolous claims. *Vaca v Sipes,* 386 US 171; 87 S Ct 903; 17 L Ed 2d 842 (1967).

It has been held that an individual member does not have the right to demand that his grievance be pressed to arbitration, and the union "obviously" is not required to carry every grievance to the highest level, but must be permitted to assess each with a view to individual merit. *Gunkel v Garvey,* 45 Misc 2d 435; 256 NYS2d 953 (1964).

Having regard for the good of the general membership, the union is vested with discretion which permits it to weigh the burden upon contractual grievance machinery, the amount at stake, the likelihood of success, the cost, even the desirability of winning the award, against those considerations which affect the membership as a whole.

In doing so, the courts have said that the union must act without fraud, bad faith, hostility, discrimination, arbitrariness, caprice, gross nonfeasance, collusion, bias, prejudice, wilful, wanton, wrongful and malicious refusal, personal spite, ill

will, bad feelings, improper motives, misconduct, overreaching, unreasonable action, or gross abuse of its discretion in processing or refusing or failing to process a member's grievance.[1]

Such considerations have led at least one Court to conclude that the fact finder must determine the state of mind or motive of the union's decision-maker. *Norman v Willis,* 402 SW2d 46 (Mo, 1966).

Our Court has not endorsed such a subjective measure of union responsibility. In the context of an action against the employer, where breach of the union's duty of fair representation was claimed, we held that an allegation that plaintiff's attempt to remedy his grievance was thwarted by lack of response and interest on the part of the union officials was a sufficient allegation that the union acted arbitrarily and with bad faith. *Pompey v General Motors Corp,* 385 Mich 537 (1971).

In the case before us, plaintiff's complaint alleges a duty of representation and a breach of that duty. It does not allege the conclusion that the defendant union's action was arbitrary and the product of bad faith, but it does allege facts from which such conclusions could be drawn.

The trial judge instructed the jury in these words:

"In other words, it is a question of pure reasonableness in the assessment of the action of the Union. Did they do what any prudent outfit would do in the circumstances that faced them? Did they make an honest effort to find out who was right and who was wrong, and did they let the blame fall right where it should; or did they take an arbitrary position, and not do what they should have done on behalf of this man?"

[1] See annotation in 34 ALR3d 884, *Union's Liability in Damages for Refusal or Failure to Process Employee Grievance,* and cases cited therein.

Defendants did not object to the charge. Under the charge as given, the jury was properly advised that the plaintiff should recover only if it found the union's refusal to take plaintiff's grievance to arbitration was arbitrary and not a fair, reasonable and honest judgment on defendants' part.

If that standard is less exacting than has appeared in other cases, it reflects a belief that a union owes a greater duty to its members than merely to refrain from persecuting them.

Every man's employment is of utmost importance to him. It occupies his time, his talents, and his thoughts. It controls his economic destiny. It is the means by which he feeds his family and provides for their security. It bears upon his personal well-being, his mental and physical health.

In days gone by, a man's occupation literally gave him his name. Even today, continuous and secure employment contributes to a sense of identity for most people.

It is no solace to a man fired from his job that his union acted without spite, animosity, ill will, and hostility toward him. If he has been wrongfully discharged by his employer, in violation of his contract of employment, a collective bargaining agreement made for his benefit and protection, it is unthinkable that he should be denied relief—denied justice—by the courts.

But it is argued that precedential authority places the worker in a cross fire between two rules of law.

He cannot bring an action against his employer because the grievance procedure established by the collective bargaining agreement must be exhausted as a condition precedent to such action. *Leadon v Detroit Lumber Co,* 340 Mich 74 (1954); *Cortez v Ford Motor Co,* 349 Mich 108 (1957); and

*Spencer v Wall Wire Products Co,* 357 Mich 296
(1959). And he cannot exhaust his contract remedy
because the final stages of the grievance machin-
ery can only be activated by the union. (But, see
the opinion of DETHMERS, J., in *Ries v Evening
News Association,* 370 Mich 614 [1963].) This, of
course, is the precise dilemma propounded so elo-
quently by Mr. Justice Black in his ringing dissent
in *Vaca v Sipes:*

"Today the Court holds that an employee with a
meritorious claim has no absolute right to have it
either litigated or arbitrated."

Indeed, the rule in *Vaca,* as observed by Mr.
Justice Black, gives the employee either two reme-
dies or none. Absent union bad faith, he can
recover against neither the union nor the com-
pany. Given union bad faith, he has an action
against both.

There are several aspects of *Vaca v Sipes,* which
suggest that the dire predictions of Mr. Justice
Black may not be inevitable. If *Vaca* is read with
one eye on the actual facts of the case, it is much
more limited than some of the sweeping conclu-
sions of the majority there. It may be that future
decisions of that eminent tribunal will not apply
its dicta uncritically.

"Quite obviously, the question which the Missouri
Supreme Court thought dispositive of the issue of liabil-
ity was whether the evidence supported Owens' asser-
tion that he had been wrongfully discharged by Swift,
regardless of the Union's good faith in reaching a
contrary conclusion. This was also the major concern of
the plaintiff at trial: the bulk of Owens' evidence was
directed at whether he was medically fit at the time of
discharge and whether he had performed heavy work
after that discharge." *Vaca v Sipes, supra,* 189–190.

In this case of Lowe, there is no basis to conclude that the trial court thought, or lead the jury to believe, that the question of whether or not Lowe had been wrongfully discharged was dispositive of the issue of the union's liability.

Indeed, unlike *Vaca,* the major concern of the plaintiff at trial here was not centered upon the cause of his discharge, but upon the events which occurred thereafter between himself and the union.

It is further to be observed that much of the Court's language in *Vaca* relates to the concept that the union, as the statutory agent of the member-employee, should have authority to represent him in disputes with the company with regard to the *settlement* of his grievance.

"Nor do we see substantial danger to the interest of the individual employee if his statutory agent is given the contractual power honestly and in good faith to settle grievances short of arbitration. For these reasons, we conclude that a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." *Vaca v Sipes, supra,* 192.

In *Vaca,* the word "settle" is used no less than eight times, and the word "settlement" is used no less than three times. The United States Supreme Court details the union's efforts on behalf of the employee in that case and details the nature of the settlement it was able to achieve on his behalf:

"The evidence revealed that the Union diligently supervised the grievance into the fourth step of the bargaining agreement's procedure, with the Union's business representative serving as Owens' advocate throughout these steps. When Swift refused to reinstate Owens on the basis of his medical reports indicating

reduced blood pressure, the Union sent him to another doctor of his own choice, at Union expense, in an attempt to amass persuasive medical evidence of Owens' fitness for work. When this examination proved unfavorable, the Union concluded that it could not establish a wrongful discharge. It then encouraged Swift to find light work for Owens at the plant. When this effort failed, the Union determined that arbitration would be fruitless and suggested to Owens that he accept Swift's offer to send him to a heart association for rehabilitation. At this point, Owens' grievance was suspended in the fourth step in the hope that he might be rehabilitated." *Vaca v Sipes, supra,* 193–194.

The Court concludes:

"In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances. See *Humphrey v Moore,* 375 U.S. 335, 349–350 [84 S Ct 363; 11 L Ed 2d 370 (1964)]; *Ford Motor Co. v Huffman,* 345 U.S. 330, 337–339 [93 S Ct 681; 97 L Ed 1048 (1953)]. In a case such as this, when Owens supplied the Union with medical evidence supporting his position, the Union might well have breached its duty had it ignored Owens' complaint or had it processed the grievance in a perfunctory manner." *Vaca v Sipes, supra,* 194.

There is a distinction, it would seem, between the discretion reposed in the union to *settle* an employee-member's grievance and the power to ignore his grievance completely. A client who retains counsel and gives him full authority to settle a claim may not be heard to complain about the amount of the settlement made in his behalf, but he may yet have cause to complain where his counsel makes no effort to settle and simply permits the statute of limitations to expire. In short, an unfettered discretion to settle a grievance is not

the same as a right to abandon the grievance. Unlike *Vaca v Sipes,* no compromise was effected or significantly attempted in this case of Lowe.

## SUMMARY

In summary, we hold that the testimony adduced at the trial of this cause and the evidence presented to the jury, taken in the light most favorable to the plaintiff, was sufficient for the jury to have concluded that the plaintiff was wrongfully discharged by his employer and that the defendant union violated its obligation toward him to afford him fair representation by making no effort whatsoever to settle his grievance, by ignoring his grievance, by processing it in a perfunctory manner, and that the plaintiff was not required, either as a matter of fact or law, to make a formal appeal to the international president or the international executive board as a condition precedent to this action against the employer and the union.

The decision of the Court of Appeals reversed, the decision of the trial court is affirmed, and the cause remanded in accordance with this opinion; costs to the plaintiff.

. T. M. KAVANAGH, C. J., and T. G. KAVANAGH and SWAINSON, JJ., concurred with T. E. BRENNAN, J.

WILLIAMS, J., concurred in the result.

LEVIN and M. S. COLEMAN, JJ., did not sit in this case.