# STATE OF MICHIGAN

# COURT OF APPEALS

WILLIAM SCOTT ZASTROW,

Plaintiff-Appellant,

v

CITY OF WYOMING and CITY OF WYOMING
ADMINISTRATIVE AND SUPERVISORY
EMPLOYEES ASSOCIATION,

Defendants-Appellees.

UNPUBLISHED
September 5, 2017

No. 331791
Kent Circuit Court
LC No. 15-006824-CK

Before: STEPHENS, P.J., and SHAPIRO and GADOLA, JJ.

SHAPIRO, J. (*dissenting*).

Plaintiff William Scott Zastrow claims that defendant City of Wyoming Administrative and Supervisory Employees Association (the union) violated its obligation to provide him with fair representation in response to his termination by defendant City of Wyoming (the city), his employer. As there was ample evidence to support this claim, we should reverse the trial court and remand for trial as to the union. Accordingly, I respectfully dissent in part.[1]

Plaintiff was a supervisor in the municipal garage that repaired and maintained City of Wyoming vehicles. On January 26, 2015, another worker in the garage discovered a loaded rifle in a police car that had been left for repairs. The gun had been left there by a police officer in violation of department policy. Plaintiff took the gun from the other employee, made it safe and had the employee place it in a secured locker. Plaintiff had complained several times previously about officers leaving loaded weapons in vehicles. While holding the weapon plaintiff made a statement that the city interpreted as a violation of workplace rules. It then terminated plaintiff's employment.

The city's termination letter indicated that plaintiff was fired because he violated two workplace rules: one barring threatening behavior and the other prohibiting theft or dishonesty including the withholding of information relevant to a city investigation. The city's letter does

---

[1] I agree with the majority in affirming the trial court's dismissal of the claim for injunctive relief.

not state why lesser sanctions were inadequate. Plaintiff asked the union to file a grievance on his behalf. They refused to do so, and this suit followed.

## A UNION'S DUTY TO REPRESENT ITS MEMBERS

When an employee is represented by a union, he may not file a grievance or lawsuit on his own behalf against the employer unless the collective bargaining agreement provides for that right.[2] Where such a provision is absent, as here, an employee is wholly dependent upon the union to file the grievance and act as his or her advocate.

The scope of this duty is defined in two Michigan cases: *Lowe v Hotel & Restaurant Employees Union, Local 705*, 389 Mich 123; 205 NW2d 167 (1973), and *Goolsby v Detroit*, 419 Mich 651; 358 NW2d 856 (1984). In my view, the majority fails to afford these cases sufficient consideration. *Lowe*, following the United States' Supreme Court's opinion in *Vaca v Sipes*, 386 US 171; 87 S Ct 903; 17 L Ed 2d 842 (1967), eloquently set forth the fundamental legal principles:

> A labor union has a duty fairly to represent its members.

> This duty arises from the nature of the relationship between the union and its members. The union and its members do not deal at arms [sic] length.

> The union speaks for the member. It makes a contract of employment on his behalf. The union offers its member solidarity with co-workers, expertise in negotiation, and faithful representation. In exchange, the member pays his union dues, and gives his support and loyalty to the union.

> In many ways, the relationship between a union and its member is a fiduciary one. Certainly, it is a relationship of fidelity, of faith, of trust, and of confidence.

> If the courts have stopped short of declaring the union and member relationship a fully fiduciary one, it is because the union, by its nature, has a divided loyalty.

> It must be faithful to each member, to be sure, but it must be faithful to all the members at one and the same time.

> The union must be concerned for the common good of the entire membership. This is its first duty.

> That duty of concern for the good of the total membership may sometimes conflict with the needs, desires, even the rights of an individual member.

---

[2] See *Saginaw v Chwala*, 170 Mich App 459, 463-464; 428 NW2d 695 (1988).

When the general good conflicts with the needs or desires of an individual member, the discretion of the union to choose the former is paramount.

When the general good conflicts with the legal or civil rights of an individual member, the courts will recognize those rights and enforce them as against the will of the majority of the union membership.

In the area of grievances, the courts have held that the union has considerable discretion to decide which grievances shall be pressed and which shall be settled. It has been said that the union has latitude to investigate claimed grievances by members against their employers, and has the power to abandon frivolous claims. *Vaca v Sipes*, 386 US 171; 87 S Ct 903; 17 L Ed 2d 842 (1967).

It has been held that an individual member does not have the right to demand that his grievance be pressed to arbitration, and the union "obviously" is not required to carry every grievance to the highest level, but must be permitted to assess each with a view to individual merit. *Gunkel v Garvey*, 45 Misc 2d 435; 256 NYS2d 953 (1964).

Having regard for the good of the general membership, the union is vested with discretion which permits it to weigh the burden upon contractual grievance machinery, the amount at stake, the likelihood of success, the cost, even the desirability of winning the award, against those considerations which affect the membership as a whole. [*Lowe*, 389 Mich at 145-146.]

Ten years after *Lowe* was decided, the Supreme Court in *Goolsby* refined these principles into a three part test:

A union's duty of fair representation is comprised of three distinct responsibilities: (1) "to serve the interests of all members without hostility or discrimination[,"] (2) "to exercise its discretion with completed good faith and honesty[,"] and (3) "to avoid arbitrary conduct." [*Goolsby*, 419 Mich at 664 quoting *Vaca*, 386 US at 177.]

A violation of any of these three responsibilities constitutes a breach of the duty of fair representation. *Id.* at 667. In reviewing the actions of the union, we must view its duty broadly given its special relationship with its members. As noted in *Goolsby*, "for purposes of PERA, we do not interpret a union's responsibility to avoid arbitrary conduct narrowly.[] In addition to prohibiting impulsive, irrational, or unreasoned conduct, the duty of fair representation also proscribes inept conduct undertaken with little care or with indifference to the interests of those affected." *Id.* at 679.

FACTS

Plaintiff had an excellent work record. During his previous 16 years of employment with the city, he had never been subject to any employee discipline, and he was given a 100% rating in the performance review conducted immediately before his termination. On the date in question he had just returned to work after several days of bereavement leave following the death of his father.

The city's workplace rules required that when a police car is left at the garage, the officers must remove all firearms from the vehicle and the garage and store them properly in the police department.[3] As noted above, this rule was not always followed, and Zastrow had several times brought it to the attention of management.[4] The initiating incident began when Randy Colvin, a garage worker, started to work on a police car and discovered that the officers had left a loaded rifle in the front seat. Colvin removed the rifle as plaintiff walked over. One of them immediately made the gun safe though it is not clear whether it was Colvin before plaintiff took the gun or plaintiff after he took possession of the rifle. Plaintiff held the rifle with two hands across his torso, he and Colvin had a conversation, the contents of which is in dispute, and he then directed Colvin to place the rifle in a secure locker until it could be returned to the police department.

Certain facts are not in dispute, though they remain obscured by the misplaced, but powerful image of workplace violence raised by defendants. First and foremost, plaintiff did not bring a weapon to work, and he never did so in the long course of his employment. He was wholly un-responsible for the presence of the weapon in the garage. In fact, he had on several occasions complained about these occurrences on the grounds of workplace safety. Second, plaintiff did not remove the gun from the police car. It is undisputed that the other employee at the scene, Colvin, removed the gun and openly held it before plaintiff approached. Third, plaintiff did not undertake any dangerous actions with the rifle; he did not point it at anyone or even in anyone's direction. He held it across his body, not directed outwards. Fourth, he saw to it that it was unloaded and placed in a safe location. Fifth, he made no threats despite the defendants' attempt to imply the contrary. There was one and only one person who heard what plaintiff said, Randy Colvin. When interviewed by the employer and by the union Colvin repeatedly confirmed that plaintiff did not threaten him, that he did not feel threatened, that plaintiff made no threats directed at others, and that he would feel completely comfortable continuing to work with plaintiff. He reported that plaintiff had, while holding the rifle, said

---

[3] Since 1986, the Wyoming Police Department manual has stated that long guns "shall be removed any time the vehicle is going out for repair" and that the weapons are to be secured in the police station armory.

[4] Plaintiff was not alone in this concern. In 2012 a police lieutenant made a written complaint about police cruisers being left in maintenance with long guns still inside. However, it appears that no offending officers, including the officer who left the gun in this case, were ever sanctioned for this dangerous conduct.

something along the lines of, "maybe I could get some respect with this," and Colvin stated that he did not view this as a threat at the time of the incident or later when interviewed.

ANALYSIS

The union asserts that it did not pursue the grievance on behalf of plaintiff for two reasons.

First it asserts that it did not do so because it did not want to set a precedent for the membership regarding what they might expect to be arbitrated in the future. This claim is at best devoid of content, and, at worst, it is clear evidence of arbitrariness. The union's brief wholly fails to articulate how pursuing plaintiff's grievance to arbitration would leave it subject to seeking arbitration for grievances that were without merit. The union's proffered concern about being overwhelmed by the burden of conducting arbitrations on behalf of its members should be viewed with substantial skepticism in light of the fact that it has not pursued a single employee grievance to arbitration in its entire history at this workplace. If the union refused to represent plaintiff in this grievance because it had a policy never to do so then the denial of representation is clearly "arbitrary conduct."

Second, the union states that after considering plaintiff's request, it concluded that the likelihood of prevailing at arbitration was low. The union is entitled to consider this factor, but it must do so fairly and in good faith. The mere fact that the union conducts an investigation does not settle the issue of good faith.[5] If the union, despite substantial evidence to the contrary, merely adopts the employer's view of the facts, then its good faith should not be assumed. Here, the record readily supports a conclusion that the union was exclusively concerned with whether it could convince the employer to unilaterally reverse its decision to fire plaintiff rather than whether it could convince a neutral arbitrator to reverse it. As I read the record, the union's assertion that plaintiff's situation could not be improved at arbitration has little basis. Indeed, a review of the record leads to the conclusion that any attorney moderately skilled at litigation who reviewed the evidence and contractual standards relevant to this grievance would conclude that there was a strong likelihood of success, either of prevailing outright or at least in reducing the sanction.

---

[5] There is also evidence that the decision to deny plaintiff's request for representation was made before the union's investigation was fully concluded. Jaimie Petrovich, a member of the Grievance Committee testified that "*[f]rom the very beginning* when we filed the Notice of Intent [March 16, 2015, 5 weeks before the Grievance Committee issued its report] and after we made our decision *it was communicated all along that there was no intent to file a formal grievance*." (Emphasis added). The majority states that "in context" Petrovich's statement did not suggest a premature decision. I disagree with this characterization. As I read the deposition and the rest of the record, it seems to me that the decision not to pursue a formal grievance was made and communicated to plaintiff early in the process. The union made clear that it filed the Notice of Intent to pursue a grievance in order to maintain pressure on the city to compromise, but in fact it had determined from the outset that it would not file a grievance.

The likelihood that a grievance would be successful turns largely on whether an arbitrator would agree with the employer's claim that plaintiff violated the two cited workplace rules, i.e. one barring dishonesty and the other barring threatening conduct. The record demonstrates that these claims rested on suspect interpretations of weak evidence. First, the termination letter stated that plaintiff violated City Rule 2(a) the rule against dishonesty because he was not fully truthful during the investigation.[6] It asserted that plaintiff had violated this rule by initially admitting on January 28, 2015 that he "had said something that [he] should not have said" during the incident but later submitted a written statement about the incident in which he stated that he, " 'did not recall' making any comments about disrespect among Public Works employees and also did not recall saying anything about getting respect while [he was] holding the gun." However, there is no documentary evidence that plaintiff ever stated that he "said something he shouldn't have." Nor did any employee state that they heard defendant make such a remark. The only evidence of this initial statement by plaintiff was the recollections of two managers, which were not documented. Thus, the premise of plaintiff's "dishonesty" rested on a "he said-he said" claim by management. Moreover, assuming plaintiff had made this admission, it contains no specific statements that plaintiff indicated he recalled saying during the incident. It appears that his lack of recollection of what he said to Colvin was consistent throughout. The union does not state why it believes the undocumented assertions of the managers. Nor does the union state why plaintiff's written statement that he "did not recall" making the comments that the managers recollected he made evidences a deliberate lie as opposed to a mere failure of memory. Given these facts, a strong case could be made that even if defendant violated this rule, a lesser sanction was in order.

The termination letter also cited City Rule #3(e), which according to the letter, "prohibit[s] abusive, intimidating, threatening or coercive treatment, physical and/or mental, of another employee." The letter did not refer specifically to any statement or conduct by plaintiff as the basis for its finding that he had violated this rule. However, the letter described the incident as follows:

> [Y]ou were in the Fleet Services area of the Public Works building and observed a staff member removing a gun from the trunk of a police vehicle. You asked the employee if the gun was loaded and he said it was not. You then took the gun to check if it was loaded and it was not. You made comments expressing your frustration about guns being in police vehicles when the vehicles are brought to Fleet Services for maintenance. During the conversation, your comments escalated emotionally and you expressed your frustration about what you perceived as a lack of respect among Public Works employees. While holding the gun across your body, you made a remark to the effect of, "Maybe now I will get some respect."

---

[6] The rule "prohibit[s] theft or dishonesty of any kind including lying, falsification of City records or reports, and withholding information in a City investigation."

Although the letter of termination ends its description of the incident at that point, it is undisputed that following his remark, plaintiff handed the gun back to the other employee and directed him to place it in the locker used for such purposes. Moreover, there is no dispute that at the time the gun was held by the plaintiff it had already been made safe.[7] And, as already noted, plaintiff was not responsible for the gun's presence. Under these circumstances, it would be quite reasonable for an arbitrator to conclude that plaintiff did not engage in threatening or intimidating behavior and that his conduct, even if unwise, did not rise to the level of good cause for termination.

CONCLUSION

Lowe instructs that "a union has the power to abandon frivolous [grievance] claims." 389 Mich at 146. Plaintiff's claim was by no means frivolous. He was fired after 16 years of excellent performance based upon an incident that occurred because someone else left a gun where it did not belong. After the gun was discovered, plaintiff handled it in a manner to protect his fellow workers. There is evidence that during the incident he made a statement that was ill-advised, but there is no evidence that he ever threatened any or presented a danger to anyone.

*Lowe* also states that "[w]hen the general good conflicts with the needs or desires of an individual member, the discretion of the union to choose the former is paramount." *Id.* However, defendant has abjectly failed to demonstrate beyond a question of fact that the "general good" of the union's membership conflicted with filing a grievance on behalf of plaintiff. To the contrary, by failing to file a grievance on plaintiff's behalf, the union sent a clear message to the membership and the employer that even where an employee has a long unblemished work record, the union will not come to the assistance of a member who makes a single mistake that results in no harm. Because the evidence clearly establishes a question of fact whether the union met its duty of fair representation I would reverse the grant of summary disposition and remand for trial.

/s/ Douglas B. Shapiro

---

[7] In addition, Colvin stated that plaintiff was "not angry," but instead seemed "tearful" and "bummed out," unsurprising feelings given that plaintiff had just returned from burying his father.