MICHIGAN STATE EMPLOYEES ASSOCIATION v DEPARTMENT OF MENTAL HEALTH

Docket No. 70418. Argued May 8, 1984 (Calendar No. 4).—Decided December 28, 1984. Released January 29, 1985.

Lyn Jones, a state civil servant, was discharged for patient neglect by the Department of Mental Health after the drowning death of a seventeen-year-old patient who was in her charge. Jones and other workers who were also discharged as a result of the drowning filed grievances. The Michigan State Employees Association, Jones' union, and Jones brought an action in the Ingham Circuit Court, seeking a preliminary injunction to prevent her dismissal until completion of the grievance procedure. The court, Ray C. Hotchkiss, J., granted the preliminary injunction and remanded the case to the Civil Service Commission for further proceedings. The Court of Appeals, M. F. Cavanagh, P.J., and Allen, J. (Penzien, J., dissenting), affirmed the grant of the preliminary injunction, finding that the plaintiff had established the type of irreparable injury necessary to support its issuance (Docket No. 55016). While the case was pending before the Court of Appeals, Jones' dismissal was reduced to a six-month suspension and she was reinstated. The defendant appeals.

In an opinion by Justice Boyle, joined by Chief Justice Williams and Justices Levin, Ryan, and Brickley, the Supreme Court *held:*

A preliminary injunction to stay the discharge of a civil servant during the pendency of grievance proceedings should issue only in extraordinary circumstances where it is shown in light of the totality of the circumstances affecting, and alternatives available to, the discharged employee that the discharge will result in irreparable injury.

1. The determination whether a preliminary injunction

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 15A Am Jur 2d, Civil Service § 84.
   Injunction as remedy against removal of public officer. 34 ALR2d 544.
[2] 15A Am Jur 2d, Civil Service §§ 10-12.
[3] 15A Am Jur 2d, Civil Service § 81.

should issue involves consideration of whether harm will be done to the public interest if the injunction is issued, whether harm to the applicant in the absence of a stay outweighs the harm to the opposing party if a stay is granted, the strength of the applicant's demonstration that the applicant is likely to prevail on the merits, and a demonstration that the applicant will suffer irreparable injury if a preliminary injunction is not granted. In this case, the analysis is limited to the question whether a sufficient showing of irreparable injury was made.

2. Absent contractual agreements to the contrary or unlawful reasons for discharge, employees in the private sector are terminable at the will of their employers. Civil servants, by contrast, may not be terminated except for just cause. Such job tenure under the merit civil service system was introduced in Michigan to attract capable and efficient persons to public employment, to ensure their retention by prohibiting arbitrary or improperly motivated dismissals, and to provide incentives for continued efficiency and industry. The guarantee of job security creates a property right for public employees which the state may take away only in accordance with due process. On the other hand, the promotion of economy and efficiency in the civil service and the protection of the public interest also require that unsuitable employees not enjoy job tenure, and instead be dismissed.

3. It is the constitutional duty of the Civil Service Commission to establish, in accordance with due process requirements, the proper balance between the need to protect civil servants' job security and the need to rid the service of unsuitable employees. While courts may provide a limited review of last resort in civil servant terminations, the determination of whether a discharge was rightful or wrongful is left primarily to civil service procedures. Under current civil service procedures, discharged civil servants are not entitled to remain on the public payroll pending exhaustion of remedies. It is not for the courts to extend through the device of the preliminary injunction protection against wrongful termination beyond that provided by the Civil Service Commission. Equitable relief should be reserved for appropriate cases. Where civil service procedures have been followed and constitutional requirements met, a preliminary injunction to stay the dismissal of a civil servant during the pendency of grievance procedures should issue only in extraordinary circumstances. However, a stay may issue where irreparable harm is shown, and other prerequisites for issuing an injunction are met.

4. Injuries suffered by a civil servant as a result of a dis-

charge must rise to a level of irreparable injury to support issuance of a preliminary injunction. In all cases, the injury must be evaluated in light of the totality of the circumstances affecting, and alternatives available to, the discharged employee. In this case, the injuries alleged were not shown to rise to the level of irreparable injury.

Reversed and remanded.

120 Mich App 39; 328 NW2d 22 (1982) reversed.

1. CIVIL SERVICE — DISCHARGE OF CIVIL SERVANTS — INJUNCTIONS.

A preliminary injunction to stay the discharge of a civil servant during the pendency of grievance proceedings should issue only in extraordinary circumstances where it is shown in light of the totality of the circumstances affecting, and alternatives available to, the discharged employee that the discharge will result in irreparable injury.

2. CIVIL SERVICE — DISCHARGE OF CIVIL SERVANTS — CIVIL SERVICE COMMISSION — INJUNCTIONS.

The Civil Service Commission, consonant with the requirements of due process, is charged with regulating the conditions of employment of civil servants, including determining whether the discharge of a civil servant is rightful; it is not for the courts, through the device of the preliminary injunction, to extend protection against wrongful termination beyond that provided by the Civil Service Commission (Const 1963, art 11, § 5).

3. CIVIL SERVICE — DISCHARGE OF CIVIL SERVANTS — STATUS PENDING APPEAL.

A civil servant who has been discharged for cause is not entitled to remain on the public payroll pending exhaustion of remedies.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *Michael E. Cavanaugh*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *George L. McCargar* and *Thomas R. Wheeker,* Assistant Attorneys General, for the defendant.

Amicus Curiae:

*Donald Pailen,* Corporation Counsel, and *Frank*

*W. Jackson* and *Trudy D. Archer,* Assistant Corporation Counsel, for the City of Detroit.

Boyle, J. We granted leave in this case to consider the appropriate standards for granting preliminary injunctions in civil service employee discharge cases. Our holding addresses the required showing of irreparable injury necessary to support the issuance of a preliminary injunction in such cases.

## I. Facts

Plaintiff Lyn Jones is a state civil servant who supports herself and her son by working as a registered nurse in the children's unit of the Clinton Valley Center, an inpatient facility operated by defendant Michigan Department of Mental Health. On September 13, 1980, while plaintiff was the nurse in charge of the unit, a 17-year-old patient drowned in a bathtub, apparently as a result of suffering an epileptic seizure. After an investigation into the death, three employees— plaintiff, the head nurse of the children's unit, and the child care worker who had taken decedent to the bath and shower room—were dismissed for patient neglect.[1]

---

[1] The record does not show whether any of the discharged employees were aware that they might be charged with neglect of the patient before the day of their termination. Prior to that day, in addition to the investigation by a fact-finding committee, the head nurse of the children's unit, who had not been on duty on the day of the drowning, had been questioned by the Clinton Valley Center (CVC) director. On September 19, 1980, the CVC personnel director received the fact-finding committee's report, which consisted of a summary of the evidence and testimony taken, as well as a memorandum on the interview with the head nurse. Within the next three hours, the three employees were fired. Each employee was summoned from duty on the children's unit to the personnel director's office and given a copy of one of the reports; the record does not show whether they were informed of what specific acts or omissions they were charged with. Each employee was then permitted to confer with their

All three employees filed grievances and, in addition, on October 3, 1980, brought suit in the circuit court seeking a preliminary injunction to prevent their dismissals until completion of the grievance procedure. In her verified complaint, plaintiff alleged irreparable injury resulting from a violation of her due process rights,[2] and from the

union representative, Mr. Berkhousen, and was represented by him in individual meetings with the CVC director and personnel director. Soon after these meetings, each employee was informed of their dismissal for "Class I Neglect."

[2] The circuit court did not address this constitutional claim. However, the Court of Appeals held that "due process does not require a civil service employee to be given a full evidentiary hearing before he or she is dismissed for cause," commenting that "[t]he United States Supreme Court, the Michigan Supreme Court, and this Court have [so] held . . . ." *MESA v Dep't of Mental Health,* 120 Mich App 39, 46-47; 328 NW2d 11 (1982). The Court cited *Arnett v Kennedy,* 416 US 134; 94 S Ct 1633; 40 L Ed 2d 15 (1974), *Rockwell v Crestwood School Dist,* 393 Mich 616; 227 NW2d 736 (1975), and *Rogers v Trenton Bd of Ed,* 61 Mich App 682; 233 NW2d 141 (1975). As the Court of Appeals and the parties recognized, the holdings of the Supreme Court of the United States as to the rights of federal civil servants are not determinative of the rights of Michigan civil servants. See *MSEA,* p 43. ("[T]he Court was dealing only with rights that should be accorded to federal employees under the federal civil service statutes. Michigan has a different civil service system. . . .") Enough members of the *Arnett* Court considered the procedural protections accorded federal employees under federal civil service regulations sufficient to satisfy due process to form a majority upholding the constitutionality of the denial of a full evidentiary pretermination hearing. As Justice White pointed out, " 'full adjudication,' including presentation of witnesses and cross-examination, need not be provided in every case where a pretermination hearing *of some kind* is required by due process," *Arnett,* pp 200-201 (emphasis added).

*Rockwell* involved the dismissal, without prior hearing, of striking teachers under PERA, legislation regulating public employee collective bargaining rights and prohibiting strikes. The only determination necessary to discharge a public employee under the statute was whether the employee was striking or not. In *Rogers,* the Court of Appeals applied the rationale of an *Arnett* plurality which was specifically rejected by the other six justices. See *Arnett,* pp 166-167 (opinion of Powell, J., joined by Blackmun, J.), p 185 (opinion of White, J.), and the dissents (Douglas, J., Marshall, J., and Brennan, J.).

The issue of the procedural due process protections accordable to discharge Michigan civil servants is not on appeal before us and has not been briefed or argued by the parties. Consequently we do not decide this question.

loss of her and her child's sole source of support. After a hearing on October 8, 1980, consisting solely of the arguments of counsel, the circuit court granted the preliminary injunction "until further order of the Court."

Defendant appealed. While the cases were pending before the Court of Appeals, plaintiff's dismissal was reduced to a six-month suspension, and she was ordered "otherwise reinstated with full back pay and benefits," at the fourth level of the grievance procedure.[3]

The Court of Appeals upheld the grant of the preliminary injunction, finding that plaintiff had "established the type of irreparable injury necessary to support" issuance. In particular,

"[s]he provides the sole financial support for [her] child, has no savings, and would have no means of supporting herself and her child if terminated from her job. In addition, if defendant is permitted to fire plaintiff employee for alleged patient neglect, it is unlikely that she will be able to obtain employment elsewhere as a registered nurse." *MSEA v Dep't of Mental Health,* 120 Mich App 39, 44-45; 328 NW2d 11 (1982).

We granted leave to appeal.

## II

Whether a preliminary injunction should issue is determined by a four-factor analysis: harm to the public interest if an injunction issues; whether harm to the applicant in the absence of a stay outweighs the harm to the opposing party if a stay is granted; the strength of the applicant's demon-

[3] Plaintiff's dismissal was reversed in August 1981, almost a year after her discharge. The other two employees were ordered reinstated with full back pay and benefits in April and June of 1981. These two employees' cases were dismissed as moot by the Court of Appeals.

stration that the applicant is likely to prevail on the merits;[4] and demonstration that the applicant will suffer irreparable injury if a preliminary injunction is not granted. See GCR 1963, 705.7(1)(b)(i). This inquiry often includes the consideration of whether an adequate legal remedy is available to the applicant.[5] Our analysis in this case is limited to the question whether a sufficient showing of irreparable injury was made to justify the issuance of a preliminary injunction where wrongful discharge from civil service employment was alleged.

## III

The legal protection of employee interests in job security is the exception, rather than the rule, in this state. In the absence of contractual agreements to the contrary, see, *e.g., Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980), and of unlawful reasons for discharge such as race or sex discrimination, private sector employees are terminable at the will of their employers.

The need to create a stable pool of public em-

[4] Defendant-appellant argues that the Court of Appeals decision must be reversed because it does not mention the requirement of a strong showing of likelihood of success on the merits. The likelihood of success on the merits was argued by plaintiff at the trial court level, and not refuted in any way by the defendant, who objected that "the merits of the dismissals are for the grievance procedure and not for this Court." Defendant's objections to proposed orders, filed after the hearing, and objecting that the Court had not made certain required findings in its oral decision from the bench, did not raise the question of a finding of likelihood of success on the merits. The Court of Appeals decision does not address this issue, therefore, because it was not properly before it. We also find the other issues raised by defendant to be without merit.

[5] None of the parties or amicus curiae in this case, and neither of the courts below, considered the question whether MCL 24.301; MSA 3.560(201); GCR 1963, 705, 706.3, are applicable to this case, and the issue was not argued before us on appeal. Thus, we do not consider this question.

ployees providing continuous meritorious service led to the adoption of different rules for public employees. Before the introduction of the merit civil service system in Michigan, the high rate of state employee turnover created economic and efficiency losses for the state due to the loss of experienced employees, as well as wasted money and time spent training new employees. Meritorious state employees were "cynical about the fruits of industry" partially because they were "fairly certain that they [wouldn't] be working for the State for any extended period." A study of the civil service system further found that many employees lacking politically powerful and influential sponsors felt compelled to spend much of their work time preserving and currying favor with persons able to influence their prospects of retaining their jobs. Report of the Civil Service Study Commission, pp 42-44, 36, 40 (1936).

In response to these problems, the patronage system was abolished, and the merit civil service system was introduced, by constitutional amendment in 1940. Const 1963, art 11, § 5. See also *Council No 11, AFSCME v Civil Service Comm,* 408 Mich 385, 397-401; 292 NW2d 442 (1980) (discussing the history of the constitutional amendment). One element of the new system was the protection of civil servants from termination except for just cause.

The purpose of job tenure in the civil service is not primarily to provide a benefit to public employees. Instead, job tenure is a means by which to promote economy and efficiency in the civil service. See 15A Am Jur 2d, Civil Service, § 1, p 6; *State ex rel Stoer v Raschig,* 141 Ohio St 477, 486; 49 NE2d 56 (1943). Providing job security to capable and efficient employees promotes these objectives in several ways: it attracts capable and effi-

cient persons to public employment, ensures their retention by prohibiting arbitrary or improperly motivated dismissals, and provides an incentive to the employees for continued efficiency and industry. See 15A Am Jur 2d, *supra;* 67 CJS, Officers, § 16, p 258; *Odau v Personnel Board of State,* 250 Wis 600, 604; 27 NW2d 726 (1947). Moreover, the guarantee of job security and fair treatment is important in maintaining a faithful and motivated public employee work force with high morale. *Toussaint, supra,* pp 613, 619.

The protection from mistreatment provided by the requirement of just cause for dismissal would be undermined if civil servants were routinely subject to the severe burdens of wrongful dismissal. Such a system might undermine the purpose of merit civil service, in that it could lead to a deterioration of the morale of public employees and a reluctance of capable people to enter the civil service.[6] Economy and efficiency might also be reduced, since new employees would have to be trained, and wrongfully discharged employees would receive back pay for time they had not worked. It is for this reason that the protection of job tenure provided by the civil service system cannot be interpreted as a mere guarantee of reinstatement and back pay in the event of wrongful discharge.

Job security is obviously an important benefit to the employee. The guarantee of job tenure absent just cause for dismissal under the Michigan civil service system creates a property right for public

---

[6] As the Civil Service Study Commission noted in 1936, "experience has shown that when employees are mistreated, the service invariably suffers through the ill effect on other employees' morale and the discouragement of good material from entering the service. It follows that dismissal procedures must be fair to the employees to be good for the service." Report of the Civil Service Study Commission, *supra,* p 40.

employees which the state may only take away in accordance with due process, *Board of Regents of State Colleges v Roth,* 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972); *Perry v Sindermann,* 408 US 593; 92 S Ct 2694; 33 L Ed 2d 570 (1972); *Arnett v Kennedy,* 416 US 134; 94 S Ct 1633; 40 L Ed 2d 15 (1974). Job security is thus an important benefit of public employment.

This Court has recognized the significance of an individual's work in his or her life:

"Every [person's] employment is of utmost importance to him. It occupies his time, his talents, and his thoughts. It controls his economic destiny. It is the means by which he feeds his family and provides for their security. It bears upon his personal well-being, his mental and physical health." *Lowe v Hotel & Restaurant Employees Union, Local 705,* 389 Mich 123, 148; 205 NW2d 167 (1973).

Discharge from public employment may make it almost impossible to obtain other work.

"Employability is the greatest asset most people have. Once there is a discharge from [government employment], dismissal may be a badge that bars the employee from other [government] employment. The shadow of that discharge is cast over the area where private employment may be available." *Sampson v Murray,* 415 US 61, 95; 94 S Ct 937; 39 L Ed 2d 166 (1974) (Douglas, J., *dissenting).*

Yet, despite the discharged employee's inability to obtain other employment, the employee may be ineligible for unemployment benefits because the "cause" for termination may constitute "misconduct" under MCL 421.29(1)(b); MSA 17.531(1)(b).

Further, the injury caused by the effects of wrongful discharge may not be fully remedied by

reinstatement and back pay.[7] As Justice Marshall pointed out:

"The availability of a backpay award several years after a dismissal is scant justice for a Government employee who may have long since been evicted from his home and found himself forced to resort to public assistance in order to support his family. And it is little solace to those who are so injured to be told that their plight is 'normal' and 'routine.'" *Sampson v Murray, supra,* 102.

Recognition of the policy favoring a stable public work force, and of the injurious effects of discharge on the employee and his or her dependents, are, however, but two of the factors in the issue to be resolved. To these factors must be added the competing policy interests mandating expeditious discharge of unsuitable civil servants.

The promotion of economy and efficiency in the civil service, and the protection of the public interest, also require that unsuitable employees not enjoy job tenure, and that they instead be dismissed from public employment. The very life of one or more human beings can sometimes depend upon the conscientious and capable performance of a civil servant's duties. The retention of such unsuitable employees might undermine the morale and motivation of other civil servants by indicating that competence and industry are unnecessary to retain a job in the civil service. Thus it is also

[7] Studies have linked unemployment with increased mental health problems, substance abuse, mortality rates, and family problems. See, *e.g., Work in America* (Cambridge, Mass: MIT Press, 1973), pp 7-8, 82, 86-87, 89-90, 182-184; Halvorsen, *How It Feels to Be out of Work,* Newsweek, vol 96, September 22, 1980, p 17; Rubenstein, *Brother Can You Spare $35K?,* Psychology Today, vol 16, December, 1982, pp 6-7; *New Health Hazard—Being out of Work,* U.S. News and World Report, vol 92, June 14, 1982, pp 81-82; Miles, *Joblessness and Health —The Hidden Cost of Unemployment,* World Press Review, vol 30, July, 1983, p 58.

in the interest of the state and its taxpayers that unsuitable employees be removed from the public payroll as quickly as possible.

We are faced, then, with competing interests and policy goals. On the one side is the state's interest in the expeditious removal of unsuitable employees. On the other side are the employee's interest in avoiding the injuries of discharge and the state's interest in avoiding the costs and consequences of wrongful termination: the unnecessary cost of training new personnel, the waste of paying back wages for time the reinstated employee has not worked, as well as the potential harms of reduced public employee morale and motivation, and of reluctance on the part of potential recruits to enter the civil service, due to the risk of injury from wrongful discharge.

## IV

Procedures created to ensure against unjust and erroneous action do not—and perhaps cannot—operate perfectly and without error. Indeed, increased protection of one interest can often be obtained only at the expense of its competing opposite interest. The distribution of the burdens and risks of error is a decision of public policy.

The United States Constitution has struck an initial, and minimum, balance between the competing interests in the area of public employee discharges by requiring that due process be accorded.[8] Beyond this, the people of this state have

---

[8] "[W]hat due process . . . require[s] under any given set of circumstances . . . [is determined by] the precise nature of the governmental function involved as well as . . . the private interest that [is] affected by governmental action," *Cafeteria & Restaurant Workers Union, Local 473 v McElroy,* 367 US 886, 895; 81 S Ct 1743; 6 L Ed 2d 1230 (1961), and "the risk of an erroneous deprivation of such interest," *Mathews v Eldridge,* 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976).

delegated to the Civil Service Commission the power to "regulate all conditions of employment in the classified service," Const 1963, art 11, § 5. It is thus the constitutional duty of the Civil Service Commission to establish, in accordance with due process requirements, the proper balance between the need to protect civil servants' job security and the need to rid the service of unsuitable employees.

While the courts provide review in the last resort to protect a civil servant's job, our role is constitutionally limited. Const 1963, art 6, § 28. The determination of whether a discharge was rightful or wrongful is left primarily, and in the first instance entirely, to civil service procedures. Final decisions terminating a civil servant are subject only to limited judicial review, determining "whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record," *id.*

While civil servants are entitled to protection from the burdens and injuries inflicted by wrongful discharge, discharged public employees are not entitled, under current civil service procedures, to remain on the public payroll pending exhaustion of remedies. Where a public policy decision has been made that the state and its employees shall bear some risk, and some of the burdens, of erroneous and wrongful discharge, it is not for the courts to extend, through the device of preliminary injunction, the protections against erroneous terminations beyond those provided by the people's delegates. The routine grant of preliminary injunctions in public employee discharge cases pending exhaustion of all remedies would destroy the balance that has been struck between the competing

interests involved. This the courts may not, and must not, do.

The United States Supreme Court has held that federal civil servants seeking a stay preventing their discharge "must make a showing of irreparable injury sufficient in kind and degree to override [those] factors cutting against the general availability of preliminary injunctions in Government personnel cases," *Sampson v Murray, supra,* p 84. The factors discussed by the *Sampson* Court involve federal law as to preliminary injunctions and the rights of federal civil servants, and are thus not applicable in Michigan law. However, we consider the requirement that our courts not undermine the balance which has been struck by the people's delegated representatives between the competing interests involved in civil servant terminations to be a factor analogous to the federal "factors cutting against the general availability of" stays in such cases.

While it is clear that in many cases a wrongfully discharged employee will suffer severe injury only inadequately remedied by a later award of reinstatement with back pay and benefits, the suffering of the rightfully discharged public employee is likely to be indistinguishable from that of the wrongfully discharged employee. Superficially, therefore, the needs of judicial administration might appear to necessitate a choice between two extremes in interpreting the "irreparable injury" requirement: either an interpretation which makes a stay available in all such cases, or an interpretation which precludes a finding of such injury in any civil servant discharge case. We do not believe that the alternatives are so limited. To the extent that *Sampson* appears to have been understood as a preclusion per se to a finding of

irreparable injury in civil servant discharge cases,[9] we decline to adopt that rationale. We are convinced of the ability of trial courts to properly apply the irreparable injury requirement, in combination with the other traditional requirements for grant of preliminary injunctions, in light of the competing policy considerations involved in civil servant discharges.

Defendant has not argued that Const 1963, art 6, § 28, limits the traditional power of the judiciary to issue preliminary injunctions in civil servant cases; nor could such a claim prevail in the absence of a provision expressly so providing. See, *e.g., Gilley v United States,* 649 F2d 449, 453 (CA 6, 1981). The traditional equitable power of the judiciary to issue such injunctions, provided for in MCL 600.601; MSA 27A.601, is available in appropriate cases. However, we hold that, where civil service procedures have been followed, and constitutional requirements met, a preliminary injunction to stay the discharge of a civil servant during the pendency of grievance procedures should issue only in extraordinary circumstances.

## V

The question in this case, then, is whether the injuries alleged rise to the level of a showing of "irreparable injury" supporting the issuance of a preliminary injunction in public employee discharge cases.

We can envision a variety of circumstances which *might,* in appropriate civil servant discharge cases, warrant a finding of irreparable injury sufficient to support the grant of a prelimi-

[9] See, *e.g., Ekanem v Health & Hospital Corp of Marion County,* 589 F2d 316 (CA 7, 1978); *EEOC v Janesville,* 630 F2d 1254 (CA 7, 1980); *Ciechon v Chicago,* 634 F2d 1055 (CA 7, 1980); *Dos Santos v Columbus-Cuneo-Cabrini Medical Center,* 684 F2d 1346 (CA 7, 1982).

nary injunction.[10] In all cases, the injury must be evaluated in light of the totality of the circumstances affecting, and the alternatives available to, the discharged employee.

While the plaintiff's verified complaint alleged violations of her due process rights, this claim was not pursued on appeal.[11] The verified complaint otherwise contained the following allegations of irreparable injury:

"9. Plaintiff Jones is a divorced mother with a nine year old son who resides with her. She is the sole support [of] that child. Further, she has an apartment upon which she must pay rent and she must make monthly payment upon her automobile, dental bills, furniture bills, school loans and other debts. She must otherwise support and feed herself and her son. She has virtually no savings. Plaintiff Jones will be unable to support herself and her son and meet her other financial obligations. . . .

"10. Plaintiff Jones will suffer immediate and irreparable harm in that she will be unable to feed and support herself and her son unless this Court restrains the Defendant from discharging her and stopping her pay."

The only other showings of irreparable injury were counsel's representations that plaintiff might be

[10] In certain circumstances, for instance, the loss of health insurance benefits where there is a serious immediate or ongoing need for medical treatment might be sufficient. See, e.g., Gonzalez v Chasen, 506 F Supp 990 (D PR, 1980). We also do not exclude the possibility that, in an otherwise strong case, the certainty that a long-term investment in a treasured possession will be lost—such as by the foreclosure of the mortgage on a long-time family home—might constitute sufficient injury.

[11] The denial of the minimum protections accorded by constitutional due process, of course, in and of itself constitutes a severe injury: burdens and deprivations are imposed in violation of constitutional rights. Moreover, the denial of due process increases the likelihood of success on the merits, since the absence of sufficient protective procedures increases the likelihood that the termination was erroneous and wrongful.

unable to obtain other employment as a nurse due to the reasons given for her discharge, and that plaintiff might be ineligible for unemployment benefits since the charge against her might constitute "misconduct" under MCL 421.29(1)(b); MSA 17.531(1)(b).[12] The trial court took no testimony, admitted no other evidence, and made no findings before granting the preliminary injunction.[13]

We do not hold that the absence of usable resources and of obtainable alternative sources of income with which to support one's self and one's dependents, coupled with the prospect of destitution, serious physical harm, or loss of irreplaceable treasured possessions, could never support a finding of irreparable injury in an appropriate case. We merely hold that the issuance of a preliminary injunction preventing discharge pending final decision in the civil service grievance procedures must be determined under the standards articulated herein.

The order of the circuit court and the judgment of the Court of Appeals are reversed and the case

[12] Plaintiff alleged that she had "virtually no savings." But what does this mean: $10, $100, $1,000, $10,000? Alternatively, if plaintiff had almost no savings, might she and her son qualify for welfare benefits? Plaintiff alleged only that she *might* not qualify for unemployment benefits; how certain or likely was this? Was the plaintiff's allegation that she could not obtain other employment as a nurse supported by experience or facts, or mere speculation? Was alternative employment providing an adequate income—as, for example, a factory worker, waitress, secretary, or laboratory worker—obtainable?

[13] We note that even in those federal cases involving an extremely high likelihood of success on the merits, the showings and findings of irreparable harm were far more detailed and extensive than those made in this case. See, *e.g., United Steelworkers of America, AFL-CIO v Fort Pitt Steel Casting Division,* 598 F2d 1273 (CA 3, 1979); *Truck Drivers v Almarc Mfg,* 553 F Supp 1170 (ND Ill, 1982); *Gonzalez v Chasen,* 506 F Supp 990 (D PR, 1980); *Schrank v Bliss,* 412 F Supp 28 (MD Fla, 1976); *Keyer v Civil Service Comm of New York City,* 397 F Supp 1362 (ED NY, 1975); *American Federation of Government Employees, Local 1858 v Callaway,* 398 F Supp 176 (ND Ala, 1975); *Assaf v University of Texas System,* 399 F Supp 1245 (SD Tex, 1975).

is remanded to the circuit court for further proceedings.

WILLIAMS, C.J., and LEVIN, RYAN, and BRICKLEY, JJ., concurred with BOYLE, J.

KAVANAGH and CAVANAGH, JJ., took no part in the decision of this case.