# STATE OF MICHIGAN

# COURT OF APPEALS

BHB INVESTMENT HOLDINGS, L.L.C., d/b/a
GOLDFISH SWIM SCHOOL OF FARMINGTON
HILLS,

      Plaintiff-Appellant,

v

STEVEN OGG and AQUA TOTS CANTON,
L.L.C.,

      Defendants-Appellees.

UNPUBLISHED
February 21, 2017

No. 330045
Wayne Circuit Court
LC No. 15-007333-CB

Before: GLEICHER, P.J., and MURRAY and FORT HOOD, JJ.

PER CURIAM.

Steven Ogg took a job with Aqua Tots Canton after being terminated by its competitor, Goldfish Swim School of Farmington Hills. Ogg's actions breached a noncompetition agreement he signed with the Goldfish franchisee, BHB Investment Holdings. BHB sought to preliminarily enjoin Ogg from working with Aqua Tots, but presented no evidence of irreparable harm. BHB later failed to establish that the agreement protected a legitimate business interest to support the issuance of a permanent injunction. Nor did BHB substantiate that it suffered any damages as a result of the breach. We discern no error in the circuit court's decisions to set aside the preliminary injunction and to summarily dismiss BHB's complaint. We affirm.

I

From June 2012 through February 2015, Steven Ogg worked part-time for BHB Investment Holdings, a partnership that owns and operates Goldfish Swim School of Farmington Hills.[1] Ogg began as a swim instructor earning $10 an hour and was promoted to a deck supervisor, earning $12.50. When hired, Ogg signed an "Employee Confidentiality, Non-Disclosure and Non-Compete Agreement," prohibiting him from working for a competitor within a 20-mile radius of any Goldfish location for a period of one year after ending Goldfish

---

[1] Goldfish is a growing chain with 65 locations in 17 states, each owned and operated by franchisees. See <http://goldfishswimschool.com/about/our-story> (accessed January 13, 2017).

employment. The agreement precluded Ogg from soliciting any Goldfish employees or customers for an 18-month period after separation. In relation to confidential information, the agreement provided:

> The Employee acknowledges that in the course of his or her employment with Goldfish, he or she will be exposed to and will obtain access to materials and information of Goldfish that constitute confidential and/or proprietary information of Goldfish, including, without limitation: . . . trade secrets; instructional materials; descriptions of Goldfish's products and services; proposed products and services; . . . identities of . . . customers and prospective customers; [and] identities of Employees and prospective Employees. . . . The agreement required Ogg to keep this type of information confidential indefinitely.

For reasons not pertinent to this appeal, BHB terminated Ogg's employment in February 2015. In April, Aqua Tots Canton hired Ogg as a swim instructor at an hourly wage of $11. It is undisputed that Aqua Tots Canton is a direct competitor of Goldfish and is located within a 20-mile radius of more than one Goldfish location. BHB learned of Ogg's new job when BHB partner, Katie Lee, visited the Aqua Tots website. BHB mailed Ogg and Aqua Tots two cease-and-desist letters. Ogg and Aqua Tots ignored these notices and continued their employment relationship.

On June 3, 2015, BHB filed suit against Ogg and Aqua Tots Canton. BHB alleged that it "devoted significant resources in training Ogg in understanding and perfecting Goldfish's swim techniques and understanding how to properly teach children to swim" and "in all respects of his job as a swim instructor." BHB iterated that Ogg had signed a noncompete agreement prior to his employment. As a result of signing this agreement and accepting employment, Ogg "had access to Goldfish's resources and training materials, information regarding swim programs, and the descriptions of Goldfish's products and services, which Goldfish devotes significant resources in developing and protecting."

BHB raised a breach of contract count against Ogg, complaining that Ogg breached the terms of his employment agreement by accepting employment with a direct competitor within two months of leaving Goldfish. Against Ogg and Aqua Tots, BHB raised claims of tortious interference with contractual relations and unjust enrichment. Specifically, BHB noted that it apprised Aqua Tots of Goldfish's contractual relationship with Ogg and Aqua Tots intentionally interfered with that relationship by refusing to honor the cease-and-desist letter. BHB argued that both Ogg and Aqua Tots were "unjustly enriched at Goldfish's expense" and equitably should not be allowed to retain that benefit. BHB further alleged that it suffered "irreparable harm" as a result of these actions and therefore sought injunctive relief.

Within the week, BHB filed a motion for a preliminary injunction pursuant to MCR 3.310. BHB contended that a preliminary injunction forcing Ogg to sever his business relationship with Aqua Tots was necessary because "[t]hrough Ogg's employment with Aqua Tots, Ogg will be using Goldfish's confidential information to compete directly with Goldfish." There was no manner by which Ogg could "prevent . . . his knowledge of Goldfish's confidential information from showing up in his work at Aqua Tots." BHB further contended that it would ultimately prevail on the merits because Ogg was in direct contravention of a reasonable

noncompete clause. Moreover, BHB argued, absent injunctive relief it would suffer irreparable harm. Ogg took a swim instructor position with a direct competitor in close proximity to Goldfish Farmington Hills, "causing Goldfish to lose customer goodwill and suffer unfair competition." Ogg could lure customers to his new location and then use his Goldfish-provided training to improve processes at Aqua Tots.

Defendants denied that a preliminary injunction was warranted. Although Goldfish and Aqua Tots were both in the business of providing swim lessons for young children, "[t]o distinguish themselves in the marketplace, both corporate franchises use vastly different philosophies on teaching children how to swim Specifically, defendants described:

> [O]ne of the key methods and techniques Aqua Tots uses is a submersion swim method with a focus on safety. Aqua Tots then teaches a progression based swim program that is distinctly different from Goldfish who relies more on a float roller over [sic] method and techniques for competitive swimming.

The two companies also track student progress differently, with Aqua Tots providing weekly reports and Goldfish quarterly

Defendants acknowledged that Ogg signed a noncompetition agreement. But in his role as swim instructor, Ogg's access to confidential information and material was limited. At most, Ogg learned the Goldfish teaching method. When Ogg moved to Aqua Tots, Aqua Tots taught him the distinct Aqua Tot teaching method and precluded Ogg from using previously learned techniques. Moreover, Ogg took no materials with him upon his exit from Goldfish, confidential or otherwise. He has had no contact with any Goldfish customer, let alone had he tried to solicit their business, defendants asserted. Just as at Goldfish, Ogg is a low-level employee at Aqua Tots with no access to highly confidential material and no role in business planning. Defendants also challenged BHB's asserted grounds for preliminary injunctive relief. First, they contended that Goldfish's noncompetition agreement was overly broad and unreasonable, especially given Ogg's low-level position. Defendants further noted BHB's lack of evidence that it would suffer irreparable harm absent an injunction. Aqua Tots had information that Goldfish had decided not enforce its noncompete agreement in the past and had suffered no great harm as a result of its employees' transfers to competitors. And even now, BHB raised only theoretical and speculative damages with no concrete example of how defendants were harming Goldfish. There simply was no evidence that Ogg had used Goldfish methods or stolen Goldfish customers or employees. Granting an injunction would cause significant harm to Ogg, on the other hand. Ogg was a competitive swimmer before taking employment with Goldfish. Denying this type of employment would cause him substantial economic hardship.

A hearing was conducted before Wayne Circuit Judge Daniel P. Ryan on June 23, 2015. The parties reiterated their arguments for the court. Defense counsel emphasized that "[t]here's a lot of fallback backlash to have entry level employees sign restrictive covenants because it doesn't protect any reasonable competitive interest because we're not soliciting. We have a different model." The court ultimately granted the preliminary injunction, noting that Ogg clearly breached his contract. Moreover, "[p]art of the reason that they may have included this is

because they know where ever the instructor goes, the students goes [sic]. Not only do coaches go but the students may follow." The court later clarified:

> The finding of irreparable harm is that Mr. Ogg signed an agreement. He was an instructor for Gold Fish [sic] Swim Club. And the expressed terms of the agreement indicate that he is not to leave and go to another club. By going to another club, that also opens the door for students from Gold Fish [sic] to go to the other club and follow their former instructor. The potential for harm as a result of that is a basis of not only for the covenant not to compete but a basis for preliminary injunction.

The court noted that the parties needed to schedule a hearing "on whether to make [the injunction] permanent" within 14 days. The judge was retiring, however, so the matter would be reassigned and heard by his successor. The preliminary injunction entered June 24, 2015. And "[a] hearing regarding the entry of a permanent injunction" was scheduled for "July 7, 2015 at 9:00 a.m. before the Honorable Maria L. Oxholm

Defendants quickly filed a motion to set aside the preliminary injunction. Defendants stated their understanding that the July 7 hearing was intended to discuss whether the injunction should be "continued" not whether it should be made permanent. They also reasserted their challenge on the merits.

The hearing before Judge Oxholm was adjourned to a later date. Only then did defendants file their answer denying BHB's allegations. In their affirmative defenses, defendants asserted that the noncompete agreement was unconscionable and imposed an undue hardship on Ogg and therefore was void.

Defendants then filed a legal memorandum opposing the preliminary injunction. In the interim, the parties had conducted discovery, including taking the depositions of Lee and Ogg. Lee admitted that BHB "has not met the standard for injunctive relief." Specifically, Lee could name no Goldfish customer who followed Ogg to Aqua Tots. If any customers did leave to follow Ogg, that lost business could be reduced to economic damages and a financial judgment could issue. Moreover, defendants contended, a permanent injunction was premature as it would grant the ultimate relief requested in this case. Given the lack of evidence of any damages, BHB was not likely to prevail on the merits and there was no danger of irreparable harm.

BHB retorted that Ogg clearly violated his noncompete agreement by accepting employment with a direct competitor in close proximity to Goldfish locations, supporting its request for a permanent injunction. This contractual breach demonstrated that BHB would likely prevail on the merits. Contrary to defendants' contentions, BHB argued, the noncompete agreement was reasonable and was narrowly tailored to protect Goldfish's business interests. BHB also challenged defendants' confusion regarding the purpose of the upcoming hearing as "feign[ed]." And absent a permanent injunction, BHB insisted, it would suffer irreparable harm by the loss of customers and the sharing of Goldfish's proprietary information.

-4-

Judge Oxholm heard the parties' arguments on July 21, 2015. Apparently, the parties met with the judge in chambers a week earlier to catch her up on the proceedings and attempt to reach a settlement. Judge Oxholm noted, "[I]t is not very clear to the Court what it was that happened at the last hearing date in front of Judge Ryan. For that reason, I'm going to set it all aside and this is going to be your hearing because I do not see where Judge Ryan went through the factors for TRO [sic], and I just want to make sure everything is established properly to do that."

In support of its request for a preliminary injunction to enforce the noncompete agreement, BHB emphasized the important role played by its swim instructors:

> [S]chool instructors at the swim schools are the face of the organization. They interact with the families. They interact with students, the children, the bread and butter of the business. And so when they're in the pool training these folks, and Judge Ryan mentioned it on the record at the last hearing, they develop relationships with those families.

Yet, BHB counsel conceded that he knew of no family that had left Goldfish to follow Ogg.

BHB continued that Ogg had access during the course of his employment to "the confidential Operations Manual by which teaches [sic] the Goldfish students, that proprietary to Goldfish." And Ogg admitted at his deposition that he accidentally used "the terminology and the training system that Goldfish uses" when he began training at Aqua Tots.

Defendants retorted that when they deposed Lee, she described "[t]hat the irreparable harm is nowhere close to what [BHB's counsel] just tried to testify to." Lee made "fatal admissions," which defendants asserted justified dismissal.

Lee testified at the hearing. She described that "swim instructors are our bread and butter. They see the children on a weekly basis. And they go through a rigorous training process to get in front of the swimmers and then effectively make them safe in the water." "They're the face of our business." Goldfish requires all swim instructors to sign the noncompete agreement, Lee averred, "[b]ecause children and their families become attached to these teachers and they will follow them in some cases to where they're going to." Lee provided the example of another former instructor, "Brad," who began teaching swim lessons for the city of Livonia after his Goldfish departure. Two Goldfish families reported Brad's new employment. However, Lee never claimed these families followed Brad to the civic program.

Lee also feared Ogg "could share our techniques and ways in which we do things in our curriculum." She described:

> We have certain ways we do floating techniques. We have a certain way to teach a child how to float on their backs. We have a certain way or making sure that they can get to rotary breathing in a certain way. To us it's proprietary. We know that this is the way we teach children to swim. I don't know how Aqua Tots [does it]. I'm not privy to their information. But I know the way Goldfish teaches it and we did it internally so much that we believe it's very much a

-5-

proprietary [sic] to why we are successful at making children safe in the water, and some continue on to be competitive swimmers.

The proprietary nature of the curriculum also came from the sequence in which Goldfish teaches different techniques, Lee testified. For example, Goldfish begins by teaching children to float as this is a lifesaving measure. Lee believed her fears had come to fruition as Ogg testified at his deposition that he accidentally used Goldfish terminology while working at Aqua Tots, although he claimed he only did this twice. Lee admitted on the stand, however, "at the moment" she had "no knowledge of any irreparable harm suffered by Goldfish." All the damages claimed were "merely hypothetical."

At the conclusion of the hearing, Judge Oxholm noted, "Judge Ryan did not have the benefit of the witness that I did today and based on the record, counsel, I do not find that you have met your burden with regard to showing irreparable harm." The judge acknowledged that Lee testified to "two bas[e]s" for establishing this harm, but found them "very speculative." The breach of contract, standing alone, was insufficient to meet this element. Moreover, Lee admitted that "[t]here has been no harm to date." Accordingly, Judge Oxholm denied BHB's request for a preliminary injunction and set aside the June 24 amended preliminary injunction.

Defendants then sought summary disposition of BHB's claims pursuant to MCR 2.116(C)(8) and (10). Defendants contended that the noncompete agreement was defective for lack of mutuality. Ogg testified at his deposition that he signed the agreement without reading it because he was told he would not be hired otherwise. Ogg also signed on both the employee and employer signature lines and no BHB or Goldfish representative countersigned. And defendants asserted that BHB waived the agreement by failing to enforce it in the past. In this respect, defendants cited Ogg's testimony that other former employees told him that BHB did not enforce the agreement when they left for other similar employment.

Defendants further argued that the noncompete agreement was unenforceable because it was unreasonable. The "hypothetical loss of customers, or the mere possibility Ogg could share [Goldfish's] teaching methods" did not amount to legitimate interests to be protected by a noncompete, in defendants' estimation. Defendants continued that caselaw supported treating entry-level employees differently from high-level employees under noncompetition agreements. In this regard, noncompete agreements could be used to prevent a former employee from giving a new employer an unfair advantage, but not to prevent a former employee "from using general knowledge or skill." Ogg was a low-level employee with general knowledge and skills in swimming and swim instruction. He had no valuable insider information that could be used for corporate espionage. Accordingly, preventing Ogg from working in his field was unreasonable.

Defendants contended that BHB's unjust enrichment claim was also meritless. BHB described no benefit gained by defendants at BHB's expense. Rather, the evidence showed that "Aqua Tots gained nothing from Ogg having previously worked for Goldfish." Ogg's previous Goldfish training was of no use at Aqua Tots as Aqua Tots required its instructors to use Aqua Tots-specific training techniques and terminology.

BHB's tortious interference with contractual relations claim also must fail, defendants asserted, because the noncompete agreement was defective and unreasonable and no potential

-6-

interference caused BHB harm. Moreover, Aqua Tots had no knowledge of the noncompete agreement and therefore could not have intentionally interfered with that contract. Ultimately, as none of BHB's claims bore merit, defendants contended that injunctive relief preventing Ogg's employment at Aqua Tots for a one-year period was not appropriate

BHB replied by again quoting the language of the noncompete agreement and emphasizing Ogg's breach by taking employment with a direct competitor. BHB argued that although Ogg was a low-level employee, he had access to the most valuable of Goldfish's proprietary information—the swim training curriculum, which he had memorized. BHB insisted that it had a legitimate interest in preventing the use of its unique teaching techniques by competitors. Moreover, the noncompete did not seek to prevent entry-level employees from using their general skill and knowledge at other places of employ; it sought to protect the investment into training employees to use the Goldfish-specific teaching methods. These methods were not a generalized skill, but required 40-hours of intensive training to learn.

BHB denied that the noncompete was defective. Ogg's failure to read the document was irrelevant and requiring an employee to sign a noncompete agreement as a condition of employment does not render the document unenforceable. There was mutual assent as BHB proposed the agreement as a condition of employment and Ogg accepted. Further, BHB denied that it waived the right to enforce the agreement. The rumor cited by Ogg was insufficient to establish waiver. Lee emphatically denied that BHB ever failed to enforce the noncompete. Rather, BHB had never been required to resort to legal action because prior situations had been resolved by the breaching employee separating from the successor employer.

In relation to its unjust enrichment claim, BHB denied that it was required to show lost business as a result of Ogg's exodus to Aqua Tots. Ogg's teaching skills were enhanced by intensive training provided by Goldfish and both he and Aqua Tots benefited from that training at BHB's expense.

BHB further contended that its tortious interference claim could not be summarily dismissed. Even if Ogg did not inform Aqua Tots of the noncompete, Aqua Tots may still have been aware of it. "For example, Aqua Tots may have general knowledge that all Goldfish employees are required to sign a noncompete agreement."

Ultimately, BHB argued, injunctive relief would be required and appropriate. BHB sought to protect Goldfish's confidential trade secrets. Allowing employees to share those secrets with competitors would damage the entire company in ways that could not be measured financially. Goldfish and BHB also would be irreparably harmed by the loss of its sole use of its unique program.

The matter had again been reassigned and Judge Lita M. Popke heard defendants' summary disposition motion. Defense counsel summarized for the court, "The issue here at heart is [BHB is] seeking to enforce a restrictive covenant, namely a broad noncompete over a minimum wage employee restricting that young man from engaging in what his only skill is being a lifelong swimmer and that's teaching children how to swim." Defendants contended, "There's nothing proprietary about teaching children how to swim, there is no legitimate interest [BHB has] in preventing this young man from being able to work at basically a minimum wage

job." This rendered the noncompete agreement "unenforceable as a matter of law." Defendants further asserted that BHB made "fatal admissions" that it had suffered no damages and had "no knowledge any proprietary information" had been used to enrich defendants.

BHB countered that summary disposition was premature because discovery was ongoing and it had noticed the depositions of two Aqua Tots managers involved in the facility's day-to-day operations who could provide relevant information whether Ogg was using his Goldfish-learned methods to Aqua Tots' advantage.[2] The court rejected BHB's contention that its swim-teaching methods were proprietary. The court noted that Goldfish placed its methods in the public domain because this was a public building and the students' parents, as well as any member of the public, could watch the lessons and glean the methods. When BHB continued to argue the point, the court reiterated that BHB only argued that "the sequencing and teaching" were proprietary and that information could be observed by the general public during lessons. "You didn't keep your technique secret or process secret, you taught it. So by its very nature you've made it, you taught that to the world, you put it into the public domain by teaching it to the world." There was no evidence that Ogg had a copy of the 40-page curriculum document that he snuck away to a competitor. The court further asserted that rather than BHB giving Ogg expertise, Ogg brought expertise to BHB; after all, BHB desired to hire Ogg because he was a competitive swimmer.

The court concluded that BHB failed to establish or even allege the specific factors to establish that its teaching curriculum was a trade secret or proprietary information, instead relying on "general conclusory statements." Accordingly, BHB could not establish a legitimate business interest it needed to protect through the noncompete agreement. BHB failed to show that Ogg "took anything with him" that could give Aqua Tots an unfair advantage. It failed to demonstrate any damage, such as through lost customers or transfer of confidential information. The court acknowledged that Ogg breached his contract, but noted the lack of any evidence that BHB was actually harmed by that breach. Accordingly, the court granted summary disposition in defendants' favor and dismissed BHB's claims. BHB now appeals.

II

BHB first contends that Judge Oxholm lacked authority to reconsider and set aside the preliminary injunction at the July 21, 2015 hearing. BHB's position would improperly limit circuit courts from handling matters before them.

Judge Ryan entered a preliminary injunction following the initial June 23 hearing as permitted by MCR 3.310(A)(1). Judge Ryan ordered a follow-up hearing to consider whether the injunction should be made permanent. This was permitted by MCR 3.310(A)(2): "Before or after the commencement of the hearing on a motion for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing on the motion."

---

[2] BHB had previously deposed Aqua Tots co-owner Brian Tomina. Tomina took no interest in the daily operations of the business and could answer no questions relevant to this case.

The hearing ordered by Judge Ryan was briefly delayed because of his retirement and the reassignment of the matter. The delay allowed the parties time to conduct some discovery and depose Ogg and Lee. It also afforded defendants an opportunity to more thoroughly challenge the preliminary injunction. Contrary to BHB's position, defendants were permitted to seek relief on the merits. See MCR 2.119(F); MCR 2.612. Judge Oxholm, as the newly assigned judge presiding over the matter, was within her right to correct any error she perceived in the proceedings. MCR 2.6013(B).

Given that defendants opposed the preliminary injunction on the merits and sought to set it aside (albeit on a limited basis) and BHB responded, BHB was on notice that vacation of the injunction would likely be considered at the second hearing, either concurrently with or before considering whether to make the injunction permanent. At the outset of the hearing, Judge Oxholm aptly noted that Judge Ryan failed to consider on the record several necessary factors before entering the injunction. This was an omission that Judge Oxholm was empowered to remedy before making any decision. See MCR 2.603(B). And Judge Oxholm heard from both sides and took witness testimony before making a decision. There was no procedural error demanding relief.

III

BHB further challenges the substantive orders entered by the circuit court denying its request for a preliminary injunction (or setting it aside) and then summarily dismissing the permanent injunction action.

Injunctions "should issue only in extraordinary circumstances." *State Employees Ass'n v Dep't of Mental Health*, 421 Mich 152, 166; 365 NW2d 93 (1985). Before entering a preliminary injunction, a trial court is required to consider certain factors. These include:

> harm to the public interest if an injunction issues; whether harm to the applicant in the absence of a stay outweighs the harm to the opposing party if a stay is granted; the strength of the applicant's demonstration that the applicant is likely to prevail on the merits; and demonstration that the applicant will suffer irreparable injury if a preliminary injunction is not granted. [*Id*. at 157-158.]

Before issuing a permanent injunction a court must consider:

> "(a) the nature of the interest to be protected,
>
> (b) the relative adequacy to the plaintiff of injunction and of other remedies,
>
> (c) any unreasonable delay by the plaintiff in bringing suit,
>
> (d) any related misconduct on the part of the plaintiff,
>
> (e) the relative hardship likely to result to defendant if an injunction is granted and to plaintiff if it is denied,
>
> (f) the interests of third persons and of the public, and

-9-

(g) the practicability of framing and enforcing the order or judgment." [*Kernen v Homestead Development Co*, 232 Mich App 503, 514-515; 591 NW2d 369 (1998), quoting 4 Restatement Torts, 2d, § 9.36, pp 565-566.]

We discern no abuse of discretion in Judge Oxholm's decision to deny BHB's preliminary injunction motion. See *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 8; 753 NW2d 595 (2008). As noted by Judge Oxholm, BHB failed to demonstrate that it would suffer irreparable harm if a preliminary injunction did not enter. "[A] particularized showing of irreparable harm . . . is . . . an indispensable requirement to obtain a preliminary injunction. The mere apprehension of future injury or damage cannot be the basis for injunctive relief." *Id*. at 9 (quotation marks and citation omitted, ellipses in original). At the July 21 hearing, Judge Oxholm had the benefit of Lee's deposition and live testimony, as well as Ogg's deposition. This evidence revealed no current danger of irreparable harm, only a speculation of future harm.

Lee admitted at deposition that she did not know whether Ogg had shared Goldfish's curriculum with Aqua Tots, but was only "fearful that he might." Lee conceded that no Goldfish franchisee could unilaterally change its curriculum even if it had access to the unique training methods employed by a competitor. Although Lee acknowledged that Aqua Tots is also a national corporation that likely had a nationwide-mandated curriculum of its own, she sidestepped questions whether a local Aqua Tots franchisee could alter its curriculum based on leaked information of competitor methods. At his deposition, Ogg merely described that he had accidentally used Goldfish terminology a couple of times early in his employment at Aqua Tots. Ogg asserted that his Aqua Tots supervisor had reminded him of the proper Aqua Tots method at that time and Ogg quickly learned to remove Goldfish techniques from his teaching.

Lee had not investigated whether Ogg took any client contact information with him when he was terminated by Goldfish. Lee had "no knowledge of any actual financial harm to Goldfish caused by either Aqua Tots or Ogg" and had "no evidence that . . . Ogg ha[d] taken any clients." She conceded that "to [her] knowledge," Goldfish had not "suffered any great injury as a result of" Ogg's new employment. And at the hearing, Lee admitted that she had "no knowledge of any irreparable harm suffered by Goldfish." Ogg noted that certain families he encountered at Aqua Tots informed him that they were former Goldfish customers, but none were solicited by Ogg or even remembered Ogg from their time at Goldfish. Moreover, Ogg insisted that he never solicited any Goldfish customer to move to Aqua Tots.

Lee's fears that Ogg might impart information about Goldfish teaching methods or solicit Goldfish customers was insufficient to support a preliminary injunction. As BHB presented no evidence to make "a particularized showing of irreparable harm," Judge Oxholm properly denied preliminary relief to BHB.

Similarly, Judge Popke properly dismissed BHB's request for a permanent injunction. In the interim, BHB gathered no evidence that Ogg had provided confidential information to Aqua Tots or that Ogg had wooed customers to his new employer. BHB contends that summary disposition was premature because discovery was still open and it had sought information to determine whether any Goldfish customers had moved to Aqua Tots. Even if Aqua Tots' records revealed that certain Goldfish students had transferred to Aqua Tots, there would be no evidence

that Ogg played any role in their decision. Accordingly, BHB failed to establish "the relative hardship likely to result . . . to plaintiff if [the injunction] is denied." Absent any evidence of injury during the six months Ogg had been employed by Aqua Tots, a permanent injunction would be improper.

IV

We further discern no error in the dismissal of BHB's remaining claims. We review de novo a lower court's resolution of a summary disposition motion. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008).

> A motion under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh*, 263 Mich App at 621. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013).]

MCL 445.774a governs an employer's ability to execute a noncompetition agreement with its employees. It provides:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited. [MCL 445.774a(1).]

Judge Popke found the current agreement unreasonable as a matter of law. We review that ruling de novo. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 506; 741 NW2d 539 (2007). We generally presume that contracts are legal, valid, and enforceable. Noncompetition agreements, however, "are disfavored as restraints on commerce and are enforceable only to the extent they are reasonable." *Id*. at 507. BHB bore the burden of establishing the contract's enforceability. *Id*. at 508.

The current covenant executed with an entry-level employee did not protect a "reasonable competitive business interest." The interest cited by BHB was to maintain the confidentiality of

-11-

Goldfish's swim instruction method. BHB related its instructional methods to a trade secret and described them as "proprietary."

A "trade secret" is something that "[i]s the subject of efforts . . . to maintain its secrecy." MCL 445.1902(d)(*ii*). BHB and other Goldfish franchisees display the Goldfish instructional method in front of hundreds of people daily. The instructors use the instructional techniques and employ Goldfish-specific terminology to teach students under the observation of the students' family members. Any member of the public can enter the facility and watch the lessons as well. A "proprietary interest," in this context, is simply "information in which the owner has a protectable interest." *Black's Law Dictionary* (6th ed), p 1219. As the subject information is revealed to the public on a daily basis, it cannot be deemed a trade secret or proprietary.

While it was reasonable to prevent Ogg from using specific Goldfish methods for a one-year period, the only evidence in this regard was that Ogg accidentally used Goldfish terminology on two occasions. The breach did not continue. Aqua Tots required Ogg to use Aqua Tots terminology and instructional methods and corrected Ogg's lapse. Therefore, BHB could establish no harm as a result of Ogg's breach of contract or Aqua Tots' possible contractual interference in this regard, warranting summary disposition. See *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mch 161, 178; 848 NW2d 95 (2014).

The noncompetition agreement's prohibition on soliciting Goldfish clients, on the other hand, was reasonable. *Follmer, Rudzewicz & Co, PC v Kosco*, 420 Mich 394, 402; 362 NW2d 676 (1984). See also *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 158; 742 NW2d 409 (2007). However, the circuit court properly dismissed BHB's claims that Ogg breached his noncompetition agreement, and that Aqua Tots interfered with the contract, in this regard. Even by the time of the summary disposition hearing, BHB had no evidence that Ogg had solicited any Goldfish client to follow him to Aqua Tots. No discovery still pending could establish that Ogg played a role in soliciting any transferring customers. Absent damages, BHB could merit no relief.

Finally, the circuit court summarily dismissed BHB's claim that Ogg and Aqua Tots were unjustly enriched by the training investment BHB made with Ogg. "Unjust enrichment is defined as the unjust retention of money or benefits which in justice and equity belong to another. No person is unjustly enriched unless the retention of the benefit would be unjust." *Tkachik v Mandeville*, 487 Mich 38, 47-48; 790 NW2d 260 (2010). Although an express contract exists in this case—the employment contract and noncompete agreement between BHB and Ogg—this does not prevent the use of the equitable remedy of unjust enrichment in this case; the contract does not cover the provision and worth of training Ogg. See *Barber v SMH (US), Inc*, 202 Mich App 366, 375; 509 NW2d 791 (1993).

We affirm. Defendants, as the prevailing parties, may tax costs. MCR 7.219.

/s/ Elizabeth L. Gleicher
/s/ Christopher M. Murray
/s/ Karen M. Fort Hood

-12-