# STATE OF MICHIGAN

# COURT OF APPEALS

WILLIAM SCOTT ZASTROW,

Plaintiff-Appellant,

v

CITY OF WYOMING and CITY OF WYOMING
ADMINISTRATIVE AND SUPERVISORY
EMPLOYEES ASSOCIATION,

Defendants-Appellees.

UNPUBLISHED
September 5, 2017

No. 331791
Kent Circuit Court
LC No. 15-006824-CK

Before: STEPHENS, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

This action arose after the city of Wyoming (the City), terminated plaintiff's employment following an incident that occurred on or about January 26, 2015. Plaintiff appeals as of right an order granting the motions for summary disposition filed by the City and plaintiff's union, the City of Wyoming Administrative and Supervisory Employees Association (the Association), regarding plaintiff's claims for breach of the duty of fair representation and breach of the collective bargaining agreement (CBA). On appeal, plaintiff also challenges an earlier order, in which the trial court denied his motion for a preliminary injunction. We affirm.

## I. BACKGROUND FACTS

In 2002, the City hired plaintiff as the Assistant Director of its Public Works Department. Plaintiff became a member of the Association at that time. Plaintiff's employment with the City was governed by various CBAs, the latest of which became effective on July 1, 2014, lasting through June 30, 2019. This CBA provided that "[n]o employee shall be discharged . . . without just cause," and in the event of a wrongful discharge, an employee could grieve such action pursuant to Article II, Section 2 of the CBA. Article II, Section 2 provides the following:

> *Step 1*. The Association shall submit a "Notice of Intent" to file a grievance, in writing, to the City Manager within fifteen (15) days after the occurrence of the matter which gave rise to the grievance.
>
> *Step 2*. Within thirty (30) days of the submission of the "Notice of Intent" to file a grievance, the Grievance Committee of the Association shall make its decision on the grievance and shall recommend to the City Manager; dismissal of

the grievance, submittal of a compromise or submittal of a formal grievance to proceed to the next step. In the event the Grievance Committee recommends dismissal, no further proceedings may be had on said grievance. In the event the Grievance Committee recommends a compromise, the City Manager shall have fifteen (15) days in which to accept or reject the compromise. If the City Manager accepts the compromise, the grievance shall be terminated. If the City Manager rejects the compromise or if the Grievance Committee has recommended processing the grievance, Step 3 shall be followed.

*Step 3.* If the grievance is not settled in Step 2, the Grievance Committee shall meet with the City Manager and the employee, and such other persons as the City Manager desires present, in an attempt to resolve the grievance. . . . [T]hereafter the Grievance Committee shall render an opinion in the same manner and within the same time limits as in Step 2. In the event of the dismissal of the grievance by the Grievance Committee, no further steps shall be taken. In the event the Grievance Committee recommends a compromise, the City Manager shall have fifteen (15) days in which to accept or reject the compromise. If the City Manager accepts the compromise, the grievance shall be terminated. If the City Manager rejects the compromise or the Grievance Committee has recommended processing the grievance, Step 4 shall be followed.

*Step 4.* The Arbitrator shall be chosen by the Association and the Employer alternately striking names from a list of five (5) arbitrators agreed to by the Association and Employer. . . . The decision of the arbitrator shall be final and binding. . . . Notice of intent to follow this step shall be filed by the Grievance Committee with the City Manager within fifteen (15) working days of the Manager's decision in the former step.

On January 26, 2015, plaintiff returned to work after taking several weeks off to care for his terminally ill father, who died on January 21, 2015. On or about this day, while working in the maintenance garage, plaintiff saw fellow employee Randy Colvin remove an M-4 semi-automatic rifle from a police cruiser that had come in for maintenance. According to plaintiff, City policy prohibited the police from sending in vehicles for maintenance with weapons still inside. When plaintiff saw Colvin removing the M-4, he approached, inquired about the condition of the firearm, and then took the rifle from Colvin, removed the magazine, checked to see if there was a round in the chamber, and made several comments before handing the rifle back to Colvin. The parties dispute what plaintiff said to Colvin while plaintiff was holding the M-4, and there were no other witnesses to the interaction, but Colvin later discussed the incident with two other employees, Dan Gard and Neal Schoen, who complained to City management.

The City investigated the incident and obtained written statements from both Colvin and Gard. Gard explained in his statement that, on the day in question, "[Colvin] met me on my side of [the] shop [and] he was very excited [and] said [plaintiff] wigged out[,] took the gun from me and said I bet I can get respect with this[,] . . . then said how [plaintiff] didn't like guns in shop and went on to say how P[ublic] W[orks] guys are disrespectful[.]" Colvin stated that plaintiff approached him and "proceeded to take the gun and check[ed] to see if it was loaded and it was not. Then he said, Randy, I wish you did not have them here (that is his pet peeve) and he said a

-2-

few things about P[ublic] W[orks] that I can't totally recall everything he said. I took the gun back and we talked for a few more minutes and he mellowed."

Public Works Director Bill Dooley and Human Resources Director Kim Oostindie interviewed Colvin about the incident. According to the meeting notes, "[Colvin] said [plaintiff] was saying some things about respect in P[ublic] W[orks], but that [Colvin] couldn't recall everything [plaintiff] said nor could he recall the specific statement [plaintiff] made." When asked about plaintiff's demeanor during the incident, Colvin said plaintiff "was emotional—not angry—but tearful and he seemed 'bummed out.' He seemed worried." Dooley asked Colvin if he felt threatened by plaintiff, to which Colvin responded, "No." During a second interview, Colvin explained that during the incident, plaintiff was upset with Public Works and said, "[T]his may solve his problems," referencing the gun. Colvin did not want to make a statement regarding what plaintiff exactly said "because I may have one word off." However, Oostindie then gave Colvin different variations of what plaintiff allegedly said during the encounter, one version being that plaintiff said to Colvin while holding the gun, "[M]aybe now I will get some respect." When asked if plaintiff had said that, Colvin replied, "Yes, something like that."

According to the City, management spoke with plaintiff about the incident on January 28, 2015, and February 19, 2015. The City claimed that during the first meeting, plaintiff "acknowledged that [he] had said something that [he] should not have said." However, on February 19, 2015, plaintiff claimed that he "ha[d] not nor will I ever threaten a coworker." Plaintiff stated that he "d[id] not recall the specific day in question," but then described the incident, explaining that he saw Colvin removing an M-4 from a police cruiser, so he approached, "took the M-4, removed the magazine, and insured the chamber was clear of a round." According to plaintiff, he expressed disappointment and concern that a police vehicle had come in for maintenance with weapons still inside, but he did not threaten his coworkers in the Public Works Department.

Following its investigation, the City suspended plaintiff's employment. The City explained that it found plaintiff's comments "escalated emotionally" during the incident and he "expressed . . . frustration about what [he] perceived as a lack of respect among Public Works employees." Then, "[w]hile holding the gun across [his] body, [plaintiff] made a remark to the effect of, 'Maybe now I will get some respect.' " The City concluded that plaintiff's conduct violated City Rule 3(e), which prohibits "abusive, intimidating, threatening or coercive treatment, physical and/or mental, of another employee or the public on City time or premises." The City also concluded that plaintiff violated City Rule 2(a) during the investigation, which prohibits "dishonesty of any kind, including lying, falsification of official City records or reports, and withholding information in a City investigation."

Plaintiff disagreed with the City's conclusions, stating that he did "not recall making the statement that the City attributed to me about getting respect." Plaintiff argued that "[i]f I did make such a statement (which I doubt), making a statement about respect does not violate any City rules or regulations, even if by happenstance I was holding (not pointing) an unloaded firearm at the time." After reviewing plaintiff's response, the City terminated plaintiff's employment on March 12, 2015.

Thereafter, plaintiff asked the Association to pursue a grievance on his behalf. The Association filed a Notice of Intent and formed a Grievance Committee to investigate the matter. During its investigation, the Committee interviewed Dooley, Oostindie, plaintiff, Colvin, and City employee Milt Zaagman about the specifics of the incident. Following its investigation, the Committee recommended against pursuing a formal grievance. On May 6, 2015, the Association Board met with the Grievance Committee and asked questions about the Committee's recommendation and obtained more details about the Committee's interviews with Colvin and Dooley. The Board then voted not to pursue a grievance on plaintiff's behalf. Association President Traci Shaffer informed plaintiff of the Board's decision, but explained that the Association was willing to try to reach a compromise with the City. Shaffer explained, however, that the Association would "not pursue the available remedies past that step in the process if a compromise cannot be reached." Plaintiff agreed to allow the Association to pursue a compromise, and the Association submitted its first offer to the City on May 19, 2015.

The City rejected the first offer and proposed a counteroffer in which it would convert plaintiff's termination to a resignation. Shaffer relayed the City's counteroffer to plaintiff, explaining, "At this point, you may choose to accept the terms proposed by the City, or schedule a meeting. . . . If an acceptable compromise is not reached at this meeting, the Association will submit their decision to dismiss the grievance as approved by majority vote of the Executive Board." Plaintiff rejected the City's counteroffer, and the Association then held a meeting with the City and plaintiff before submitting a second offer. The City also rejected the second offer, reasserting its initial counteroffer of allowing plaintiff to change his termination to a resignation. On July 27, 2015, the Association informed the City that it had sent the counteroffer to plaintiff, but it did not hear back from him and would not be pursuing a formal grievance on his behalf.

That same day, plaintiff filed the instant action, claiming that the Association breached its duty of fair representation because it failed to follow the grievance procedure in the CBA and the City breached the CBA because it fired plaintiff without just cause. Plaintiff also filed a motion for a preliminary injunction, asking the court to compel defendants to arbitrate his grievance. The trial court denied plaintiff's motion, concluding that the City was not contractually obligated to arbitrate the dispute, plaintiff had not demonstrated irreparable harm, and there were no significant public interests at stake because the case involved a private dispute.

Thereafter, the Association filed a motion for summary disposition, arguing that plaintiff failed to present sufficient evidence demonstrating that the Association acted arbitrarily or in bad faith by choosing not to pursue plaintiff's grievance to arbitration. The City concurred in the motion and further asked the court to dismiss plaintiff's breach of contract claim, arguing that an employee whose employment is governed by a CBA cannot pursue a breach of contract claim against an employer unless the employee first establishes a breach of the duty of fair representation by the representative union. Following a hearing, the trial court granted defendants' motions under MCR 2.116(C)(10).

## II. PRELIMINARY INJUNCTION

On appeal, plaintiff first argues that the trial court erred by denying his motion for a preliminary injunction compelling defendants to arbitrate his grievance. We review for an abuse of discretion a trial court's decision to grant or deny a motion for mandatory injunctive relief.

*Dep't of Environmental Quality v Gomez*, 318 Mich App 1, 32; 896 NW2d 39 (2016). "An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes." *Id.* at 33-34 (quotation marks and citation omitted).

"Injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there is a real and imminent danger of irreparable injury." *Janet Travis, Inc v Preka Holdings, LLC*, 306 Mich App 266, 274; 856 NW2d 206 (2014). In deciding whether to issue a preliminary injunction, courts consider

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued. [*Alliance for Mentally Ill of Mich v Dep't of Community Health*, 231 Mich App 647, 660-661; 588 NW2d 133 (1998).]

A particularized showing of irreparable harm is an indispensable requirement to obtain injunctive relief. *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 9; 753 NW2d 595 (2008). "Equally important is that a preliminary injunction should not issue where an adequate legal remedy is available." *Id.*

In this case, plaintiff failed to demonstrate that he was entitled to arbitration under the CBA. Plaintiff argues that the Association was required to pursue his grievance to arbitration under Step 3 of the CBA once it submitted the second offer because Step 3 states, "If the City Manager rejects the compromise . . . *Step 4 shall be followed.*" (Emphasis added.) However, as the trial court noted, Step 4 of the grievance procedure required the Association to file "[n]otice of intent to follow this step . . . within fifteen (15) working days of the Manger's decision in the former step," which the Association did not do. Therefore, at the time plaintiff filed his complaint, the City was no longer contractually obligated to arbitrate his grievance.

Further, plaintiff failed to make a showing of irreparable harm because he could obtain an adequate remedy at law in the form of money damages if he prevailed on his claims against the City and the Association. See *Pontiac Fire Fighters*, 482 Mich at 10. Plaintiff argues that the irreparable harm in this case was the denial of his choice of forum to resolve his grievance against the City because the outcome of the case could depend on who was chosen to resolve the dispute. However, the mere inability to present his case before an arbitrator does not constitute a particularized harm, considering that plaintiff cannot prove that an arbitrator would necessarily return a decision in his favor. Moreover, the fact that plaintiff's claims *might* be more successful before an arbitrator is not proper grounds to obtain a preliminary injunction because an injunction will not issue upon speculative injury. *Pontiac Fire Fighters*, 482 Mich at 8-9.

Finally, the balance of harms and the public interest factors favor the trial court's decision. The interests at stake in this case are largely personal to plaintiff, and even in the absence of an injunction, plaintiff could pursue his claims against the City and the Association before the trial court where a determination could be made regarding whether he was entitled to damages. In contrast, requiring the City to arbitrate plaintiff's grievance would have granted

plaintiff relief that he was no longer entitled to under the CBA. Therefore, the trial court did not abuse its discretion by denying plaintiff's motion for a preliminary injunction.

## III. SUMMARY DISPOSITION

Plaintiff next argues that the trial court erred by summarily dismissing his claims against the Association and the City. We review de novo a trial court's decision to grant or deny a motion for summary disposition. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Murad v Prof & Admin Union Local 1979*, 239 Mich App 538, 541; 609 NW2d 588 (2000). "This Court considers the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party to determine whether a genuine issue of any material fact exists to warrant a trial." *Id.*

The duty of fair representation is an implied duty that requires a labor union to fairly and impartially represent all members within its bargaining unit. *Martin v East Lansing Sch Dist*, 193 Mich App 166, 180; 483 NW2d 656 (1992). The duty encompasses three responsibilities: (1) serving a member's interests without hostility or discrimination, (2) exercising discretion in good faith and honesty, and (3) avoiding arbitrary conduct. *Goolsby v Detroit*, 419 Mich 651, 664; 358 NW2d 856 (1984), citing *Vaca v Sipes*, 386 US 171, 177; 87 S Ct 903; 17 L Ed 2d 842 (1967). In processing or refusing to process a grievance, a union must act

> without fraud, bad faith, hostility, discrimination, arbitrariness, caprice, gross nonfeasance, collusion, bias, prejudice, willful, wanton, wrongful and malicious refusal, personal spite, ill will, bad feelings, improper motive, misconduct, overreaching, unreasonable action, or gross abuse of its discretion in processing or refusing or failing to process a member's grievance. [*Knoke v East Jackson Pub Sch Dist*, 201 Mich App 480, 487; 506 NW2d 878 (1993).]

The duty of fair representation further prohibits a union from acting with "(a) impulsive, irrational or unreasoned conduct, (b) inept conduct undertaken with little care or with indifference to the interests of those affected, (c) the failure to exercise discretion, and (d) extreme recklessness or gross negligence." *Goolsby*, 419 Mich at 682. Negligence alone does not constitute a breach of the duty of fair representation. *Id.* at 680.

A union has broad discretion to decide what grievances to pursue to arbitration and must be given the latitude to assess each grievance according to its individual merit. *Knoke*, 201 Mich App at 486. "An individual employee does not have the absolute right to have a grievance taken to arbitration, even where, in some instances, the employee's grievance against the employer may have merit under the terms of the applicable collective bargaining agreement." *Silbert v Lakeview Ed Ass'n*, 187 Mich App 21, 25-26; 466 NW2d 333 (1991). A plaintiff "cannot pursue his breach of contract claim against [an employer] unless he is successful in his claim of breach of the duty of fair representation." *Knoke*, 201 Mich App at 485.

Plaintiff first argues that the Association failed to follow the grievance procedure in the CBA. On this point, we agree. To begin, the Grievance Committee did not make a decision on the grievance within 30 days after the Association submitted the Notice of Intent in Step 1.

Then, the Grievance Committee recommended against pursing a grievance on plaintiff's behalf, and the Association Board likewise voted not to pursue a grievance. The language of the CBA does not require the Board to vote on the Committee's decision before the Committee submits its recommendation to the City,[1] and the record does not show when or if the Grievance Committee decided to submit a compromise offer on plaintiff's behalf. Yet, on May 12, 2015, Association President Shaffer informed plaintiff that the Association was willing to pursue a compromise on his behalf. Two compromise offers were submitted to, and rejected by, the City under Steps 2 and 3. Under Step 3 of the grievance procedure, "[i]f the City Manager rejects the compromise . . . *Step 4 shall be followed.*" (Emphasis added.) Therefore, under the plain language of the CBA, once the Association submitted the compromise offer under Step 3 and the City Manager rejected that offer, the Association was required to follow Step 4 of the grievance procedure. The Association argues that it was not required to follow Step 4 because it decided from the beginning not to pursue plaintiff's grievance to arbitration. However, the language of the CBA does not support that the Association had this option. Rather, if the Association did not intend to pursue plaintiff's grievance to arbitration in Step 4, it should have dismissed the grievance before submitting a second compromise offer in Step 3.

Nonetheless, the mere fact that the Association did not strictly follow the grievance procedure does not mean that it breached its duty of fair representation. In *Pearl v Detroit*, 126 Mich App 228, 238 n 4; 336 NW2d 899 (1983), this Court explained that "[a]n incorrect interpretation by the union of a collective bargaining clause, in the absence of bad faith, does not impose liability upon the union." In *Goolsby*, 419 Mich at 680, our Supreme Court explained that, "[a]bsent a reasoned, good-faith, non-discriminatory decision not to process a grievance," if a union fails to comply with the grievance procedure in a collective bargaining agreement, "the union has acted arbitrarily and breached its duty of fair representation." However, a reasoned, good-faith, non-discriminatory decision includes "[f]or example, because the grievance has no merit, or, even if it has merit, because it is not in the best interests of the majority of the union membership." *Id.* at 680 n 13.

Plaintiff has not shown that the Association decided not to pursue his grievance to arbitration as the result of bad faith. Indeed, the Association made its decision only after concluding that the grievance lacked merit and that pursing the grievance would not be in the best interests of the majority of the union membership. See *Goolsby*, 419 Mich at 680 n 13. Before reaching this conclusion, the Grievance Committee conducted an investigation that included interviews of Dooley, Oostindie, Colvin, plaintiff, and Zaagman. From the information

---

[1] Although the CBA grievance procedure does not require a vote by the Board, the Association's Bylaws are seemingly inconsistent with this procedure and provide the following:

> Within (10) working days of filing of the notice of intent with the City, the Committee shall submit its written recommendation to the Board. Whereupon, the Board shall, within fifteen (15) days of receipt of the recommendation of the Ad Hoc Grievance Committee, shall make its decision on whether to file a formal grievance with the City.

obtained during the interviews, the Committee determined that plaintiff had not been forthcoming and completely truthful and that, during the incident in question, plaintiff was emotional while holding a weapon and made a statement "referencing how the weapon could be used," the implication of which "was to the effect of gaining respect or as a solution to a problem." Under the circumstances, the mere fact that the Association did not strictly follow the grievance procedure would not sustain a breach of the duty of fair representation claim.

Plaintiff argues that the Association breached its duty of fair representation because it decided not to pursue his grievance to arbitration before investigating the matter. Specifically, plaintiff cites the deposition testimony of Jaime Petrovich, a member of the Grievance Committee, in which she stated that the Association decided not to pursue plaintiff's grievance "[f]rom the very beginning when we filed the Notice of Intent and after we made our decision it was communicated all along that there was no intent to file the formal grievance." Read in context, however, Petrovich's testimony does not suggest that the Association decided not to pursue plaintiff's grievance before the investigation occurred. Rather, Petrovich was explaining that the Association's first decision was against pursuing a formal grievance on plaintiff's behalf, and that this remained the Association's position throughout the parties' negotiations.

Plaintiff argues that the Association breached its duty of fair representation by refusing to evaluate whether City policy prohibited the police from bringing in vehicles for maintenance with weapons still inside. Whether City policy prohibits this conduct, however, is irrelevant to whether plaintiff made threatening statements while holding a weapon or was dishonest about his statements during the City's investigation. Plaintiff argues that the Association distorted the record regarding whether he violated any City rules because Colvin stated that he did not feel threatened by plaintiff. However, the fact that Colvin did not personally feel threatened does not suggest that plaintiff's statements could not be construed as threatening to other employees.

Plaintiff also argues that the Association failed to consider his long and favorable employment history and to explain what steps it took to determine that he would not prevail at arbitration. Again, however, plaintiff's employment history is irrelevant to whether he breached a City rule during the incident in question or during the City's subsequent investigation. Further, the Association explained its conclusion that there was insufficient evidence to successfully arbitrate plaintiff's grievance by pointing to the fact that plaintiff was unable to provide details or an explanation of the incident to refute the statements of other employees and because plaintiff's purported lack of memory regarding his statements was inconsistent with his memory of other details of the incident and his conversations with employees after the fact.

Citing the testimony of Petrovich and Shaffer, plaintiff argues that the Association breached its duty of fair representation because it has never pursued a grievance to arbitration. However, Petrovich testified that she "d[id] not know if [a grievance] has gone all the way to arbitration," and Shaffer testified only that the Association had not pursued a grievance to arbitration for "as long as I've been involved with the Association . . . . I don't know about prior to that." Moreover, plaintiff offered no evidence to suggest that the Association systematically refuses to pursue grievances to arbitration, as opposed to merely lacking a reason to do so. In any event, the manner in which the Association has historically processed grievances has no bearing on whether it properly processed plaintiff's request that it pursue a grievance on his behalf.

Finally, plaintiff argues that the trial court erred by dismissing his claims because his case is substantially similar to *Lowe v Hotel & Restaurant Employees Union, Local 705*, 389 Mich 123; 205 NW2d 167 (1973). In *Lowe*, a union decided not to pursue a plaintiff's grievance to arbitration after he was involved in an altercation with another employee. *Id.* at 133-134. The union representative who performed the investigation "had known plaintiff for many years . . . [and] felt that the plaintiff did not deserve to be reinstated in his job." *Id.* at 134. Despite the fact that the union representative "was unable to determine where the fault lay for instigating the altercation[,] [h]e nonetheless concluded that plaintiff had attacked [the other employee], that plaintiff had choked her, [and] that plaintiff was 'in the wrong[.]' " *Id.* The Supreme Court concluded that the union breached its duty of fair representation to the plaintiff by "making no effort whatsoever to settle his grievance, by ignoring his grievance, [and] by processing it in a perfunctory manner[.]" *Id.* at 152.

In contrast to *Lowe*, plaintiff cannot show that any member of the Grievance Committee was predisposed against him, and the record demonstrates that the Association only decided not to pursue plaintiff's grievance to arbitration after a thorough investigation by the Grievance Committee and additional inquiry by the Association Board. Unlike the union in *Lowe*, which ignored the plaintiff's grievance and made no effort whatsoever to settle the grievance, the Association in this case conducted extensive investigation and settlement negotiations between the City and plaintiff. Therefore, *Lowe* does not mandate a contrary result.

Considering the facts outlined above, plaintiff has not shown that the trial court erred by dismissing his breach of the duty of fair representation claim against the Association. Likewise, the court did not err by dismissing plaintiff's breach of contract claim against the City.[2]

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Michael F. Gadola

---

[2] See *Knoke*, 201 Mich App at 485 ("[A plaintiff] cannot pursue his breach of contract claim against [an employer] unless he is successful in his claim of breach of the duty of fair representation.").